315 F.3d 80
 In re Laura STOLTZ, Debtor.
Laura Stoltz, Debtor-Appellee,
v.
Brattleboro Housing Authority, Creditor-Appellant,
United States Trustee and Raymond J. Obuchowski, Chapter 7 Trustee, Trustees.
 Docket No. 01-5048.
 United States Court of Appeals, Second Circuit.
 Argued: December 4, 2001.
 Decided: December 20, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Geoffry Walsh, Vermont Legal Aid, Springfield, VT, for Appellee.
 Rebecca A. Rice, Cohen & Rice, Rutland, VT, for Appellant.
 Jonathan H. Levy, Department of Justice, Washington, DC, for Amicus Curiae, United States of America.
 Before: WALKER, Chief Judge, NEWMAN and F.I. PARKER, Circuit Judges.
 Chief Judge JOHN M. WALKER, JR., dissents in a separate opinion.
 F.I. PARKER, Circuit Judge.
 
 
 1
 Creditor-appellant Brattleboro Housing Authority appeals from the judgment of the United States District Court for the District of Vermont (J. Garvan Murtha, Chief Judge) entered February 14, 2001, reversing the judgment of the United States Bankruptcy Court for the District of Vermont (Colleen A. Brown, Judge) entered September 18, 2000, which had granted creditor-appellant Brattleboro Housing Authority's motion for relief from automatic stay. Granting the motion for relief from automatic stay permitted Brattleboro Housing Authority to proceed with the eviction of debtor-appellee Laura Stoltz. The bankruptcy court narrowly construed 11 U.S.C. § 525(a), the antidiscrimination provision of the Bankruptcy Code that protects debtors from discrimination by governmental units with regard to certain grants, concluding that section 525(a) does not protect debtor-tenants from eviction by public housing authorities for nonpayment of prepetition rent. By narrowly construing section 525(a), the bankruptcy court sidestepped a potential conflict between section 525(a) and 11 U.S.C. § 365, the executory contracts provision of the Bankruptcy Code that equates rejection of an unexpired lease with prepetition breach of the lease, thus enabling creditors to pursue state law remedies, including eviction, for prepetition breach of rejected leases. The district court reversed and reinstated the automatic stay, thereby preventing the eviction, on the ground that the antidiscrimination provision precludes a public housing authority from evicting a debtor-tenant from public housing based on nonpayment of discharged, prepetition rent. We agree that the bankruptcy court construed section 525(a) too narrowly. We are therefore faced with a conflict between Bankruptcy Code sections 525(a) and 365 reminiscent of Dr. Seuss's intractable North Going and South-Going Zax.
 
 
 2
 And it happened that both of them came to a place. Where they bumped. There they stood. Foot to foot. Face to face.
 
 
 3
 Dr. Seuss, The Sneetches and Other Stories 26 (1961, renewed 1989). For the reasons set forth herein, we conclude that section 525(a) controls over section 365 and precludes the Brattleboro Housing Authority from evicting debtor-appellee Laura Stoltz. We therefore affirm the judgment of the district court.
 
 I. BACKGROUND
 
 4
 Debtor-appellee Laura Stoltz ("Stoltz") and her three dependents have resided since 1993 in a Brattleboro, Vermont apartment that is part of a government subsidized housing development owned and managed by the Brattleboro Housing Authority ("BHA"). The most recent lease agreement between Stoltz and BHA was executed on August 1, 1996. The month-to-month lease stipulated a rent of $560.00 per month, payment of which on the first of each month would trigger automatic renewal of the lease, so long as Stoltz also complied with the enumerated tenant duties.
 
 
 5
 The tenant-landlord relationship between Stoltz and BHA was subsequently strained due to Stoltz's occasional failure to make monthly rent payments during times of financial hardship. In 1997, Stoltz failed to pay rent for July and August. As a result, BHA notified Stoltz on August 1, 1997, that it would terminate the lease on September 1, 1997, if she failed to redeem and reinstate the lease by then.
 
 
 6
 BHA commenced an eviction proceeding against Stoltz in Windham County Superior Court in October 1997. On December 18, 1997, the superior court granted judgment to BHA in the amount of $4,838.73 and awarded BHA possession of the apartment. The superior court's judgment was entered on December 23, 1997, by order indicating that a writ of possession would issue on December 31, 1997. Stoltz filed a Chapter 13 bankruptcy petition and reorganization plan on December 26, 1997. Stoltz's bankruptcy filing triggered an automatic stay under 11 U.S.C. § 362(a), staying the issuance of the writ of possession.
 
 
 7
 In her reorganization plan, Stoltz proposed to cure her default by paying all backrent and to assume the lease. BHA opposed Stoltz's motion to assume the lease and moved for relief from the automatic stay. The bankruptcy court issued an order on June 3, 1998, denying Stoltz's motion to assume the lease and granting BHA's motion for relief from stay. The bankruptcy court concluded that Stoltz's lease had expired according to its own terms upon Stoltz's failure to make the 1997 rent payments, a conclusion that required the denial of Stoltz's motion to assume the lease, as only unexpired leases may be assumed by Chapter 13 debtors. 11 U.S.C. § 365(a) (2001). The bankruptcy court lifted the automatic stay on the grounds that Stoltz had no equity in the apartment and the apartment was not necessary to an effective reorganization. The bankruptcy court also denied confirmation of the reorganization plan, as its sole purpose was the assumption of the lease.
 
 
 8
 On appeal by Stoltz, the district court concluded that Stoltz's lease had not expired under Vermont state law because the writ of possession had not issued. Because Stoltz therefore retained a possessory interest in the lease, the district court reversed the bankruptcy court's denial of Stoltz's motion to assume the lease, to the extent it was based on the erroneous conclusion that the lease had expired prepetition. The district court remanded the case to the bankruptcy court for determination of whether Stoltz's motion to assume the lease should nonetheless be denied on alternative grounds. The district court's judgment implicitly reversed the bankruptcy court's decision to lift the automatic stay.
 
 
 9
 BHA appealed to this Court, and the bankruptcy court postponed its hearing regarding Stoltz's Chapter 13 reorganization plan pending the appeal. By judgment entered on November 29, 1999, this Court affirmed the district court's decision, similarly concluding that Stoltz's lease had not expired under Vermont law. Brattleboro Hous. Auth. v. Stoltz, (In re Stoltz), 197 F.3d 625, 631 (2d Cir.1999) ("[U]nder Vermont law, a debtor who retains a possessory interest in a residential tenancy has an `unexpired' lease at least until the writ of possession is issued.") This Court did not reach the central issue in this opinion, i.e., the interplay of section 525(a), the antidiscrimination provision of the Bankruptcy Code which may, under certain circumstances, prohibit eviction of a debtor-tenant for nonpayment of prepetition rent, and section 365, the executory contract provision of the Bankruptcy Code which may, under certain circumstances, permit eviction of a debtor-tenant for nonpayment of prepetition rent.
 
 
 10
 In light of this Court's decision, the bankruptcy court subsequently accepted Stoltz's Chapter 13 reorganization plan. Stoltz thereafter made payments of $1,433.63 toward her past due rent of approximately $3,400.00.
 
 
 11
 Stoltz remained current on her rent for the majority of the two-year period following her Chapter 13 bankruptcy filing, but she again faltered while experiencing financial difficulties at the end of 1999. Stoltz did not pay rent in October, November, and December 1999, or in January 2000. As a result of this nonpayment of rent, BHA filed a new motion for relief from stay on January 20, 2000, in order to commence eviction proceedings.
 
 
 12
 The bankruptcy court granted Stoltz's request to convert her Chapter 13 case to a Chapter 7 case in February 2000. By order dated February 11, 2000, Stoltz's prepetition debts were discharged with an effective conversion date of February 7, 2000. The conversion to Chapter 7 mooted Stoltz's motion to assume the lease.[1] In September 2000, the bankruptcy court granted BHA's motion to modify the automatic stay, thereby permitting BHA to proceed with the eviction proceeding against Stoltz, on the ground that "11 U.S.C. § 525(a) does not protect the debtor from eviction where there is a payment default which would otherwise entitle a non-government landlord to relief from stay." In re Stoltz, No. 97-11879, 2000 WL 33667824, at *7 (Bankr.D.Vt. Sept.18, 2000).
 
 
 13
 On appeal by Stoltz, the district court reversed the bankruptcy court's decision and reinstated the automatic stay, concluding that section 525 prohibits a public housing authority from evicting a tenant, even though section 365 requires a debtor or bankruptcy trustee to cure defaults in order to assume an unexpired lease. This appeal followed.
 
 II. DISCUSSION
 
 14
 This appeal presents an internal Bankruptcy Code conflict that has divided the bankruptcy courts and district courts that have considered it. Section 525(a), also known as the antidiscrimination provision of the Code,[2] provides that a governmental unit may not discriminate against a person with respect to certain grants solely because that person, inter alia, has had a debt discharged under the Bankruptcy Act. Section 365(b) of the executory contracts section of the Code requires a debt or to cure prepetition defaults as a precondition of assuming an executory contract. If a Chapter 7 trustee does not assume or reject an unexpired lease within sixty days of the order for relief, then the lease is deemed rejected under section 365(d)(1) Upon rejection, the lease is no longer part of the bankruptcy estate, and the non-debtor party to the contract may generally pursue state law remedies for breach of contract, including eviction for breach of lease. See supra note 1.
 
 
 15
 Depending on the breadth attributed to section 525(a), a conflict between sections 525(a) and 365 may arise in situations, like Stoltz's, where a debtor seeks to retain and executory contract or unexpired lease with a governmental unit after having her debt discharged in bankruptcy, but without curing the related prepetition defaults. If the public housing grant protected under section 525(a) includes the public housing lease itself, or, put another way, includes the debtor-tenant's current right to participate in the public housing program, then the antidiscrimination provision is at odds with the executory contract provision, which would require Stoltz to cure, not simply have discharged, her debt to BHA as a precondition of assuming the public housing lease. If, on the other hand, section 525(a) is construed to only protect the debtor-tenant's future right to participate in the public housing program, then there is no conflict between sections 525(a) and 365, and BHA may proceed with the eviction.
 
 A. Standard of Review
 
 16
 The rulings of a district court acting as an appellate court in a bankruptcy case are subject to plenary review. In re Mazzeo, 167 F.3d 139, 142 (2d Cir.1999). Accordingly, this Court reviews the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. McCord v. Agard (In re Bean), 252 F.3d 113, 116 (2d Cir.2001).
 
 
 17
 B. Development of the Antidiscrimination Provision
 
 1. Codification of Perez v. Campbell
 
 18
 Section 525(a) evolved from Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), a seminal bankruptcy case in which the Supreme Court struck down a state statute that withheld driving privileges from debtors who failed to satisfy motor-vehicle-related tort judgments against them, even if the judgments were discharged under bankruptcy law. The Supreme Court used the Supremacy Clause to invalidate the state statute, finding that it discriminated against debtors in a manner that frustrated and was contrary to the fresh start principles of the Bankruptcy Act. Id. at 649-52, 91 S.Ct. at 1711-13. Congress thereafter signaled its approval of the Perez holding by enacting section 525(a), which prohibits bankruptcy-based discrimination by governmental units against debtors. Section 525(a) states, in relevant part, that:
 
 
 19
 [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.
 
 
 20
 11 U.S.C. § 525(a) (2001) (emphasis added). Notably, the text of Section 525(a) does not limit its scope to the facts presented in Perez. Section 525(a) applies to any governmental unit, not just a State agency or department; it covers not only licenses, but also permits, charters, franchises, and other similar grants; and it applies regardless of whether the governmental unit involved is the creditor whom the debtor failed to pay, or is simply a grantor conditioning a grant on the debtor's satisfaction of a discharged debt owed to a third party.
 
 2. Case Law Development of Section 525(a)
 
 21
 In the nearly twenty-four years that have passed since its enactment, section 525(a) has been interpreted by the courts to protect debtors from discrimination in a wide variety of contexts, including a debtor's right to operate a motor vehicle, see, e.g., In re Adler, 47 B.R. 554 (Bankr. S.D.Fla.1985) (holding section 525(a) prohibits enforcement of statute that allows state department of motor vehicles to suspend licenses and registrations of judgment debtors, even if motor-vehicle-related judgments against them were discharged in bankruptcy); ability to engage in a trade or business, see, e.g., In re Walker, 927 F.2d 1138 (10th Cir.1991) (finding statute, which automatically revokes real estate license of any licensee for whom payment was made from real estate recovery fund, contravenes section 525(a)); and ability to obtain essential goods and services, In re Heath, 3 B.R. 351 (Bankr.N.D.Ill. 1980) (holding state university's refusal to release student-debtor's transcript until he paid prepetition debt in full violated section 525(a)).
 
 
 22
 Despite more than twenty years of judicial consideration, however, the scope of Section 525(a)'s protection in the context of public housing is still unsettled. No circuit court has yet spoken on the issue, and the bankruptcy courts and district courts that have done so have done so inharmoniously. It is undisputed that a public housing authority is a governmental unit within the meaning of 525(a).[3] See 11 U.S.C. § 101(27); see also In re Robinson, 169 B.R. 171, 176 (N.D.Ill.1994), In re Szymecki, 87 B.R. 14, 16 (Bankr.W.D.Pa. 1988). BHA has conceded as much in this appeal. Instead, the debate over section 525(a) in the public housing context has centered on (1) the precise contours of the "other similar grant[ ]" at stake, compare Johnson v. Chester Hous. Auth. (In re Johnson), 250 B.R. 521, 530 (Bankr. E.D.Pa.2000) (determining that the "other similar grant[ ]" protected by section 525(a) was the public housing tenant's in separable rights to lease a residence and to be charged rent reductions established for public housing residents), and In re Curry, 148 B.R. 966, 972 (Bankr.S.D.Fla. 1992) (finding eviction would violate section 525(a) because it would revoke the governmental grant of a rent subsidy) with In re Bacon, 212 B.R. 66, 74-75 (Bankr.E.D.Pa.1997) (finding eviction permissible because section 525(a) protects only debtor-tenant's future right to participate in public housing program), and (2) whether a public housing authority in this situation seeks to evict the public housing tenant "solely because" of the discharge of prepetition defaults, compare Robinson v. Chicago Hous. Auth. (In re Robinson), 169 B.R. 171, 176 (Bankr.N.D.Ill.1994) (distinguishing between eviction solely because debtor-tenant failed to pay dischargeable debt and eviction because debtor-tenant stopped paying rent), and Hous. Auth. of Pittsburgh v. James (In re James), 198 B.R. 885, 888 (Bankr.W.D.Pa.1996) (distinguishing between eviction solely because of the failure to pay dischargeable debt and eviction (1) because the lease is no longer in effect because it was deemed rejected, (2) because of housing authority's duty to taxpayers to ensure that tenants pay rent, and (3) because of housing authority's obligation to other applicants to make housing available to them), with Bacon, 212 B.R. 66, 75 (disagreeing with "[t]he illusory distinction between seeking eviction for not paying a dischargeable debt as opposed to eviction for stopping the payment of rent").
 
 
 23
 C. The Public Housing Grant Protected Under Section 525(a)
 
 
 24
 In addition to its concession that it falls within section 525(a)'s definition of a "governmental unit," BHA also concedes that Stoltz's prepetition defaults have been discharged, and that it may not discriminate against Stoltz with regard to a section 525(a) grant because of her prepetition defaults. Nonetheless, BHA argues that the eviction it seeks is not proscribed by section 525(a) because a public housing lease is not an "other similar grant[ ]" within the meaning of section 525(a). BHA appears to argue that a public housing tenant's future right to participate in the public housing program is the only protected public housing grant under section 525(a). In this scenario, Stoltz's protected public housing grant would not be disturbed by eviction because eviction would not limit her right to participate in the public housing program in the future. If this line of thinking were correct, section 525(a) would prohibit BHA only from denying Stoltz, upon reapplication, a future lease because of her prepetition defaults.
 
 
 25
 We reject this artificially narrow construction of section 525(a) because the plain language of the provision indicates that eviction would revoke a protected grant, i.e., the lease, in violation of section 525(a). "[W]e begin [statutory interpretation] with the understanding that Congress says in a statute what it means and means in a statute what it says." Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (internal quotation marks and citation omitted). "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." United States v. Ron Pair Enter., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (internal quotation marks and citation omitted).
 
 
 26
 The text of section 525(a) states that it protects a debtor's interest in a "license, permit, charter, franchise, or other similar grant" provided by a governmental unit. The term "other similar grant" is not defined by the code.[4] In common parlance, a grant is "a transfer of property by deed or writing." Merriam Webster's Collegiate Dictionary 507 (10th ed.2000). As a legal term, a grant is "[a]n agreement that creates a right of any description other than the one held by the grantor. Examples include leases, easements, charges, patents, franchises, powers, and licenses." Black's Law Dictionary 707 (7th ed.1999) (emphasis added). Similarly, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." Id. at 898. Thus, a public housing lease is a grant by which a public housing authority conveys to a public housing tenant the right to use and occupy public housing in exchange for rent. The only question that remains is whether a public housing lease is a grant "similar" to a "license, permit, charter, [or] franchise."
 
 
 27
 The common qualities of the property interests protected under section 525(a), i.e., "license[s], permit[s], charter[s], franchise[s], and other similar grants," are that these property interests are unobtainable from the private sector and essential to a debtor's fresh start. For instance, a real estate license, state university transcript, or driver's license may only be obtained from a particular governmental unit. A debtor who cannot obtain her real estate license will be unable to pursue her chosen profession; a debtor who cannot obtain his transcript will be unable to apply for certain jobs or further schooling; a debtor who cannot obtain a driver's license will be unable to commute to many jobs or school.
 
 
 28
 Public housing leases, too, are property interests unobtainable from the private sector and essential to a debtor's fresh start. Public housing leases are, by definition, obtainable only from governmental entities.[5] Furthermore, a public housing lease is essential to a debtor's fresh start. An individual qualifies for public housing because he or she cannot afford housing at prevailing market rates. In light of the notoriously lengthy waiting lists that may exist for public housing, see, e.g., Housing Auth. Of Pittsburgh v. Collins (In re Collins), 199 B.R. 561, 568 n. 13 (Bankr W.D.Pa.1996), an evicted debtor-tenant along with any dependents, would quite possibly become homeless — a status not conducive to economic survival. A debtor-tenant's future right to participate in public housing programs — on a space available basis — would therefore be of little or no practical value upon eviction. A debtor-tenant's "entire economic status [therefore] is dependent on" his or her current public housing lease, In re Day, 208 B.R. 358, 367 (Bankr.E.D.Pa.1997), which is his or her "single most significant material possession," In re Whitsett, 163 B.R. 752, 755 (Bankr.E.D.Pa.1994). Eviction-induced homelessness would "seriously affect the debtors' livelihood [and] fresh start." H. Rep. No. 95-595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6323. Conversely, preventing homelessness promotes the Code's fresh start policy by helping debtors maintain steady employment and self-sufficiency.
 
 
 29
 BHA urges us to follow, as did the bankruptcy court below, the reasoning of In re Bacon, 212 B.R. 66 (Bankr.E.D.Pa.2000). The Bacon analysis bifurcated the public housing authority into separate creditor and grantor roles, finding that a public housing authority is constrained by section 525(a) only in its role as a grantor of a public benefit, but remains unconstrained in its role as a creditor, "so long as [the debtor-creditor relationship] is not being utilized to deprive the [d]ebtor of a protected grant." Id. at 75-76. The Bacon court then defined the protected grant as "the [future] right to participate in public housing," id. at 75, and it expressly declined to include the public housing lease itself in its definition of the protected grant, id. at 75, n. 17. Bacon then concluded that a public housing authority, in its creditor role, may evict a debtor-tenant for nonpayment of discharged, prepetition rent because such eviction would not deprive the debtor of his or her future right to participate in the public housing program, even though it would result in "temporary loss of a public housing unit for the Debtor as she awaits the assignment of a new unit." Id. at 76. Thus, Bacon's holding results in a strained temporal separation of the public housing grant into a current, unprotected right to participate in public housing and a future, protected right to participate in public housing.
 
 
 30
 We see two serious errors with this approach. First, the Bacon court's interpretation of section 525(a)'s protected grant in the public housing context is not based on the text of section 525(a). Bacon constructed its interpretation of a protected public housing grant based on its belief that it need not preserve the debtor-tenant's right to fully participate in the government program, but instead need only preserve the debtor-tenant's right to participate in the public housing program to some degree. Bacon, 212 B.R. at 75, n. 17. Nothing in section 525(a)'s text or legislative history, however, indicates that the protected grant should be defined as anything less than the grant in its entirety, let alone as the debtor's smallest discernable interest in the benefit at issue.
 
 
 31
 Second, the text of section 525(a) expressly proscribes revocation and suspension of a protected grant, not just denial of or refusal to renew a grant upon application. Because eviction results in revocation of the debtor-tenant's current participation in the public housing program, eviction revokes the protected grant in violation of 525(a). Permitting the debtor only to reapply to receive future housing benefits does not ameliorate the discriminatory revocation of the debtor-tenant's protected public housing lease.
 
 
 32
 Beyond its incompatibility with the text of section 525(a), Bacon's holding is also problematic because it does not comport with the congressional intent underlying section 525. Section 525(a) was enacted to protect debtors from bankruptcy-based discrimination by governmental units that provide essential services. Yet, Bacon's holding would effectively protect the debtor's interest in essential services only where the governmental unit is a non-creditor. Where the governmental unit is a grantor and a creditor — that is, where the governmental unit is even more involved, and private actors are not involved the debtor would effectively receive no protection from section 525(a) against the governmental unit's bankruptcy-based discrimination. This incongruous result cannot be what Congress intended.
 
 
 33
 D. Whether Eviction is "[S]olely [B]ecause" of Discharged Prepetition Rent
 
 
 34
 Alternatively, BHA focuses on section 525(a)'s "solely because" language and argues that it desires to evict Stoltz only because she breached her public housing lease, not because she failed to pay prepetition rent that was discharged in bankruptcy. This unpersuasive argument is premised on an "illusory distinction" between the breach of the lease and the nonpayment of the discharged prepetition rent. Bacon, 212 B.R. at 75. The breach is not an additional basis for eviction beyond that prohibited by section 525(a); it is the very basis for discrimination prohibited by 525(a). Had Stoltz breached the lease by failing to comply with an enumerated tenant duty other than the duty to pay prepetition rent, BHA might have a permissible basis for eviction under section 525(a). That factual scenario is not before us. Stoltz breached the lease because she failed to pay prepetition rent, which was later discharged in bankruptcy. Therefore, saying that BHA desires to evict Stoltz for breach of the lease is the equivalent of saying BHA desires to evict her "solely because ... [she] has not paid a debt that was discharged under the Bankruptcy Act." 11 U.S.C. § 525(a) (2001). Evicting Stoltz under these circumstances would constitute discrimination against her in violation of section 525(a).
 
 
 35
 Because we have discerned from the plain text of section 525(a) that a public housing lease, and therefore the debtor-tenant's current right to participate in the public housing program, is a protected grant, it is unnecessary to delve into section 525(a)'s legislative history. We note briefly, however, that the legislative history fully supports our interpretation of "other similar grants" as inclusive of public housing leases.[6]
 
 
 36
 E. Resolving the Conflict Between Sections 525(a) and 365
 
 
 37
 Because section 525(a) protects debtor tenants like Stoltz from eviction for nonpayment of discharged prepetition rent section 525(a) conflicts with section 365. The bankruptcy trustee did not assume the lease under section 365(b)(1); accordingly, Stoltz's public housing lease has been deemed rejected under section 365(d)(1), thus permitting BHA to pursue state law remedies on the ground that Stoltz breached the lease prepetition, see section 365(g).[7] Sections 525(a) and 365 therefore cannot simultaneously be given their full effect. If we protect Stoltz from bankruptcy-based discrimination under section 525(a), we cannot allow BHA to evict her. If we do not allow BHA to evict Stoltz, however, then we cannot enforce the executory contract assumption requirements or the implications of rejection under section 365. Thus, we face a conflict between sections 525(a) and 365 of the Bankruptcy Code. Unlike the Zax in the prairie of Prax, however, these important Bankruptcy Code provisions cannot be left in conflict, unbudged in their tracks.
 
 1. Specificity Analysis
 
 38
 Many courts have resolved this impasse by concluding that either section 525(a) or section 365[8] is the more specific provision and therefore trumps the other, more general provision. Compare Curry, 148 B.R. at 972 (finding section 525(a) more specific than section 365(b)(1)(A) because section 525(a) addresses a specific type of creditor and creditor behavior), with In re Collins, 199 B.R. 561, 567 (Bankr.W.D.Pa.1996) (finding section 365 more specific than section 525(a) because section 365 is "about as specific as it can be about what it takes to assume a lease and section 525(a) does not even mention leases"), In re James, 198 B.R. 885, 890 (Bankr.W.D.Pa.1996) (same), In re Caldwell, 174 B.R. 650, 654 (Bankr. N.D.Ga.1994) (same). The bankruptcy court in this case, for instance, ruled that "the more specific language of § 365(d)(1) must be read to trump the general provisions of § 525(a)." The district court determined that section 525(a) is more specific, even though "`specificity' is not easily measured, because Congress acted to codify a judicial holding that addressed a specific set of facts and because it fashioned the provision to compel only `governmental units' to take measures to prevent interference with a debtor's fresh start." Stoltz, 259 B.R. at 260-61.
 
 
 39
 It is a "basic principle of statutory construction that a specific statute... controls over a general provision," HCSC-Laundry v. United States, 450 U.S. 1, 6, 101 S.Ct. 836, 839, 67 L.Ed.2d 1 (1981). Based on the text alone, without regard to each provision's meaning, section 365's claim to greater specificity, based on the invocation of the more specific word "lease" instead of the more general term "grant," seems no more compelling than section 525(a)'s claim to greater specificity, based on its use of the specific term "governmental unit," as compared to section 365's failure to discuss the public or private status of the grantor. Focusing on the meaning of sections 525(a) and 365 in the housing context, however, makes plain that section 525(a) is the more specific provision. As discussed above, section 365 indicates that landlords (in general) may evict debtor-tenants for nonpayment of discharged prepetition rent. Section 525(a), on the other hand, specifically prohibits landlords who are also governmental units from evicting debtor-tenants solely because of nonpayment of discharged prepetition rent. Thus, these two sections dictate precisely opposite outcomes — except that section 365 applies to all landlords, whereas section 525(a) applies only to landlords which are also governmental units. Coupled with the district court's persuasive reasoning, our specificity analysis convinces us that section 525(a) is the more specific provision.[9]
 
 2. Sound Bankruptcy Policy
 
 40
 Our determination that section 525(a) should control on the basis of specificity is supported by sound public policy and the overarching goals of the Bankruptcy Code. The Code seeks to give debtors like Stoltz a fresh start. "Congress made it a central purpose of the bankruptcy code to give debtors a fresh start in life and a clear field for future effort unburdened by the existence of old debts." In re Bogdanovich, 292 F.3d 104, 107 (2d Cir.2002). Similarly, section 525(a) was enacted to ensure that governmental units do not deprive debtors of grants that are essential to a debtor's fresh start. "This section permits further development [of the Perez rule] to prohibit actions by governmental or quasi-governmental organizations ... that can seriously affect the debtors' livelihood or fresh start...." H. Rep. No. 95-595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6323. As already discussed, Stoltz's fresh start would be thwarted if we were to permit BHA to evict her on the basis of nonpayment of debts discharged in bankruptcy.
 
 
 41
 Of course, creditors also receive protection from the Bankruptcy Code. In order to assume an unexpired lease, the executory contract provision requires the bankruptcy trustee to cure defaults, 11 U.S.C. § 365(b)(1)(A), compensate for losses, 11 U.S.C. § 365(b)(1)(B), and provide adequate assurance, 11 U.S.C. § 365(b)(1)(C), thereby protecting the creditor's pecuniary interests before requiring a creditor to continue a contractual relationship with a debtor. If a debtor or trustee does not assume an unexpired lease under section 365(b)(1), then the lease is deemed rejected under section 365(d)(1). The landlord may then pursue state law remedies for breach, so long as the landlord does not attempt to reaffirm the debt in violation of section 524.[10]
 
 
 42
 Giving section 525(a) its full effect, however, will only marginally abbreviate the benefit BHA receives under section 365. It is undisputed that BHA, as a governmental unit, may not deny Stoltz a future public housing lease on the basis of the discharged prepetition rent. The only benefit BHA seeks, therefore, is eviction. Whether Stoltz remains in her apartment or is evicted and later readmitted to BHA's public housing, she is obligated to pay all postpetition rent. Neither Stoltz's discharge nor section 525(a) diminishes her obligation to pay postpetition rent, and the Code expressly prohibits Stoltz from receiving another discharge under bankruptcy for at least six years. 11 U.S.C. § 727(a)(8). In the interim, Stoltz may be evicted if she breaches her lease by postpetition default. Therefore, all of BHA's creditor-interests are protected, regardless of whether Stoltz is evicted or not.[11]
 
 
 43
 Given the serious harm posed to Stoltz's fresh start, and the minimal benefit BHA would receive, curtailment of BHA's state law remedy of eviction serves the sound public policy of granting debtors a fresh start and does the least mischief to the purposes underlying sections 525(a) and 365 of the Bankruptcy Code. We therefore conclude that, when sections 365(b) and 525(a) come "foot to foot" in the public housing context, section 365(b) must step aside and let section 525(a) pass.
 
 III. CONCLUSION
 
 44
 For the foregoing reasons, we affirm the district court's reversal of the bankruptcy's court's order to lift the automatic stay. Section 525(a) protects debtor-tenants like Stoltz from eviction on the basis of nonpayment of discharged prepetition rent. To the extent sections 525(a) and 365 of the Bankruptcy Code conflict, the rules of statutory construction and sound bankruptcy policy dictate that section 525(a) must prevail. BHA is therefore permanently enjoined from enforcing its judgment for possession against Stoltz.
 
 
 45
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 Whereas the Bankruptcy Code specifically gives a Chapter 11 debtor the authority to assume an unexpired lease,see 11 U.S.C. § 1107(a), "there is no corresponding provision in the code for a chapter 7 debtor." In re Rodall, 165 B.R. 506, 507 (Bankr.M.D.Fla. 1994). Under Chapter 7, only the bankruptcy trustee may exercise the option to assume or reject a lease. See In re Knight, 211 B.R. 747, 748 (Bankr.D.Or.1997). Stoltz's public housing lease was deemed rejected by the trustee by operation of law under 11 U.S.C. § 365(d)(1). See In re Sheard, 1999 WL 454260, at *3 (Bankr.E.D.Pa. June 24, 1999) ("[I]n virtually every Chapter 7 no-asset case the trustee realizes no benefit from assuming the debtor's residential lease, and thus in virtually every Chapter 7 no-asset case, the residential lease is deemed rejected...."). A rejected lease is abandoned and no longer property of the estate. Rejection, however, is not the same as termination. In re Blackburn, 88 B.R. 273 (Bankr.S.D. Cal. 1988). A rejected lease is treated as if the debtor breached it immediately prior to the petition date, 11 U.S.C. § 365(g), and the parties are generally left with the rights and remedies available outside of bankruptcy law, Rodall, 165 B.R. at 508.
 
 
 [2]
 Although courts and commentators generally refer to section 525(a) as the antidiscrimination provision, section 525 contains two additional antidiscrimination provisions, which were added after the 1978 enactment of section 525(a). Section 525(b), enacted in 1984, prohibits discrimination against debtors by private employers. 11 U.S.C. § 525(b)(1999). Section 525(c), enacted in 1994, prohibits discrimination against debtor-borrowers on the basis of discharged, unrepaid loans by governmental units operating a student loan or grant program. 11 U.S.C. § 525(c) (2001). Section 525(c) signaled congressional disapproval ofGoldrich v. New York State Higher Educ. Servs. Corp., 771 F.2d 28 (2d Cir.1985), in which this Court had narrowly construed section 525(a)'s "other similar grant" language to not include extensions of credit. Neither section 525(b) nor section 525(c) is implicated by this appeal.
 
 
 [3]
 The Bankruptcy Code defines "governmental unit" to include: "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27)
 Paragraph 27's legislative history indicates that "governmental unit" is defined "in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality, or foreign state, and a department, agency or instrumentality of any of these entities. `Department, agency, or instrumentality' does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function." S.Rep. No. 95-989, at 24 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810; see also H. Rep. No. 95-595, at 311 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6268.
 
 
 [4]
 The omission of a statutory definition for the term "other similar grant" is unsurprising in light of the antidiscrimination provision's legislative history, which indicates that "... the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination..." and delegates to the judiciary the responsibility "to mark the contours of the anti-discrimination provision in pursuit of sound bankruptcy policy." H. Rep. No. 95-595, at 366-67 (1977),reprinted in 1978 U.S.C.C.A.N. 5963, 6323.
 
 
 [5]
 Section 8 leases, on the other hand, arguably do not fall within the protection of section 525(a) because they are government-subsidized leases for privately owned housing units between a qualifying tenant and a private landlordSee In re Rosemond, 105 B.R. 8, 9 (W.D.Pa.1989).
 
 
 [6]
 The legislative history specifically rejects a narrow construction of the antidiscrimination provision and makes clear that 525(a) protects the debtor's fresh start
 [S]ection [525(a)] is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a state bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union. The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.
 H. Rep. No. 95-595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6323.
 
 
 [7]
 Section 365(b)(1) states, in relevant part, that:
 If there has been a default in an ... unexpired lease of the debtor, the trustee may not assume such ... lease unless, at the time of assumption of such ... lease, the trustee — (A) cures, or provides adequate assurance that the trustee will promptly cure, such default; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such ... lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such ... lease.
 11 U.S.C. § 365(b)(1)(A)-(C). Section 365(d)(1) states, in relevant part, that:
 In a case under chapter 7 of this title, if the trustee does not assume or reject an ... unexpired lease of residential real property... of the debtor within 60 days after the order for relief, ... then such ... lease is deemed rejected.
 11 U.S.C. § 365(d)(1). Section 365(g)(1) states, in relevant part, that:
 [R]ejection of an ... unexpired lease of the debtor constitutes a breach of such ... lease ... immediately before the date of the filing of the petition....
 11 U.S.C. § 365(g)(1).
 
 
 [8]
 Some courts argue that section 365(b)(1), which sets forth the requirements for assumption of an unexpired lease, is more specific than section 525(a). Others refer to 365(d)(1), which states that an unexpired lease that has not been assumed or rejected by the bankruptcy estate within sixty days of the bankruptcy filing will be deemed rejected, as the more specific provision. We consider both sections, alone and in combination
 
 
 [9]
 In its amicus curiae brief, the United States contends that section 525(a) should be construed narrowly to avoid "undermin[ing] ... important housing statutes" that provide for eviction of public housing tenants for nonpayment of rent. Section 525(a) specifically exempts three federal statutes from its scope, and no federal housing statutes are among them. If, as amicus curiae suggests, Congress clearly intended for these federal housing statutes to trump section 525(a), then Congress could have specifically excluded them in the text of section 525(a)
 
 
 [10]
 Eviction would not run afoul of section 524's antireaffirmation policy, which prohibits public and private creditors from seeking to reaffirm prepetition debt discharged in bankruptcy. 11 U.S.C. § 524
 
 
 [11]
 Perhaps BHA seeks the benefit of the lengthy public housing waiting lists, a "benefit" not contemplated by the text of section 365, that would enable it to evict Stoltz and then deny her public housing for years on the basis of the waiting list
 
 
 JOHN M. WALKER, JR., Chief Judge, dissenting:
 
 46
 Because I believe that 11 U.S.C. § 525(a) of the Bankruptcy Code does not apply to residential leases and that 11 U.S.C. § 365 does apply to public housing leases, I respectfully dissent.
 
 
 47
 Like the Majority, I start with the text of § 525(a). "[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant ... solely because" a person is or has been bankrupt. 11 U.S.C. § 525(a). Because a residential lease is not included among the four enumerated governmental grants to which § 525 applies, the question is whether a residential lease is a "similar grant."
 
 
 48
 The Majority states that the common quality connecting "license, permit, charter [and] franchise" is "that these property interests are unobtainable from the private sector and essential to a debtor's fresh start." Maj. Op., supra, at 90. But the fact that these interests are unobtainable from the private sector derives from the fact that § 525(a) is directed to "government unit[s]" and not to the particular character of licenses, permits, charters and franchises, as these interests can also be obtained from the private sector. Nor does the quality of being "essential to the debtor's fresh start" plainly derive from "license, permit, charter, [and] franchise." Although some interests such as a vendor license, may be essential to a bankrupt's fresh start, others, such as a recreational fishing license, are not. The Majority seems to have read "similar" out of the statute because its definition of "similar grant" is likely to encompass all possible government grants to individuals.
 
 
 49
 The specified grants — license, permit, charter, and franchise — share a more definite similarity: Each allows the grant-holder to engage in certain regulated conduct. The government grants real estate, drivers, liquor, or medical licenses; building or emissions permits; bank or corporate charters; and cable television or electricity distribution franchises. As the Sixth Circuit recently stated, the common thread is the "government's role as a gatekeeper in determining who may pursue certain livelihoods." Toth v. Mich. State Hous. Auth., 136 F.3d 477, 480 (6th Cir. 1998) (holding that § 525(a) does not apply to an extension of a home improvement loan). Thus, I believe that a "similar grant" is a grant relating to authorization to engage in income-generating conduct. This interpretation of "similar grant" is supported by the focus on employment in the remainder of § 525(a) and in § 525(b), each of which forbids the firing of bankrupt employees. 11 U.S.C. § 525(a) and (b). Because education is often critical to getting a job, § 525(c)'s prohibition of discrimination against bankrupts in the granting of student loans is also consistent with the goal of allowing bankrupts to earn a living. 11 U.S.C. § 525(c).
 
 
 50
 Therefore, I read § 525(a) not to apply to a residential lease. Such leases do not directly enable their holders to engage in the kind of an income-generating activity as do licenses, permits, charters, and franchises. This reading finds additional support from the fact that Congress specifically refers to leases elsewhere in the Bankruptcy Code, see, e.g., 11 U.S.C. §§ 363, 365, 929, and 1169, but failed to include leases among § 525(a)'s enumerated interests.
 
 
 51
 Any lingering uncertainty about this interpretation evaporates when one considers § 525(a) in the context of the entire Bankruptcy Code. "[E]very part of a statute must be construed in connection with the whole, so as to make all the parts harmonize...." Market Co. v. Hoffman, 101 U.S. 112, 116, 25 L.Ed. 782 (1879). In particular, "where possible, provisions of a statute should be read so as not to create a conflict." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 370, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).
 
 
 52
 Thus, the potential conflict between § 365 and § 525(a) is properly considered when interpreting § 525(a). As the Majority recognizes, if we read § 525(a) to apply to residential leases, it is placed in direct conflict with § 365 of the Bankruptcy Code. Maj. Op., supra, at 92. Thus, as a matter of sound statutory construction, if it is reasonable to construe "similar grants" as not including residential leases, that course is preferable if it will avoid creating a conflict.
 
 
 53
 Finally, construing § 525(a) to not include leases makes sense as a matter of public housing policy. It is important to recognize that Stoltz is not simply asking to be allowed to keep her lease; she is asking for a preference over other families waiting for public housing whose need for housing is as great as hers. Moreover governments depend on the rent received on public housing leases to sustain the viability of the entire program. Congress emphasized the importance of requiring prompt rental payments from public housing tenants when it conditioned contributions to public housing agencies on "the establishment of satisfactory procedures designed to assure the prompt payment and collection of rents and the prompt processing of evictions in the case of nonpayment of rent." 42 U.S.C. § 1437d(c)(4)(B). The Majority's interpretation will remove the incentive for bankrupt public housing tenants to assume the lease and cure pre-petition debts to the public housing authority as is required by § 365. See 11 U.S.C. § 365(b)(1)(A). My interpretation will better enable public housing systems to remain viable through a regime of prompt rental receipts. Replacing delinquent tenants who have rejected their lease during bankruptcy with the next needy family in line will encourage assumption of residential leases during bankruptcy and enhance the system as a whole.
 
 
 54
 I respectfully dissent.