20-3902(L)
*Springfield Hosp., Inc., Springfield Med. Care Sys., Inc. v. Guzman*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2021

(Argued: October 28, 2021   Decided: March 16, 2022)

No. 20-3902, No. 20-3903

_____

SPRINGFIELD HOSPITAL, INC., SPRINGFIELD MEDICAL CARE SYSTEMS, INC.,

*Plaintiffs-Appellees,*

— v. —

ISABEL GUZMAN, IN HER CAPACITY AS ADMINISTRATOR FOR THE U.S. SMALL BUSINESS ADMINISTRATION,

*Defendant-Appellant.**

_____

Before:          KEARSE, LOHIER, and BIANCO, *Circuit Judges.*

In response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act" or the "Act"), which established the Paycheck Protection Program ("PPP").  The PPP authorized the

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Isabel Guzman, Administrator of the U.S. Small Business Administration, is automatically substituted for former Administrator of the U.S. Small Business Administration Jovita Carranza as Defendant-Appellant.

Small Business Administration (the "SBA") to guarantee favorable and potentially forgivable loans to businesses negatively impacted by the pandemic. In administering the program, the SBA decided to automatically bar any applicant who was a debtor in bankruptcy from receiving PPP funds.

Plaintiffs-Appellees Springfield Hospital, Inc. and Springfield Medical Care Systems, Inc. (together, "Springfield") are debtors in bankruptcy who applied for and were denied PPP funds solely due to their bankruptcy status. Springfield initiated this adversary proceeding in bankruptcy court against Defendant-Appellant, the Administrator of the SBA, in her official capacity, challenging the SBA's administration of PPP funds and requesting that the bankruptcy court enjoin the SBA from denying its PPP application on the basis of its bankruptcy status. Specifically, Springfield asserted that: (1) the SBA's decision to exclude bankrupt debtors from obtaining PPP loans violated Section 525(a) of the Bankruptcy Code, which provides that "a governmental unit may not deny . . . a license, permit, charter, franchise, or other similar grant" to a debtor in bankruptcy solely because of that status, 11 U.S.C. § 525(a); and (2) the SBA is not immune from injunctive relief under the Small Business Act, 15 U.S.C. § 634(b)(1).

The Bankruptcy Court for the District of Vermont (Brown, *J.*) held, in relevant part, that PPP funds were "other similar grant[s]" under Section 525(a) and that Section 634(b)(1) did not bar it from enjoining the SBA. The bankruptcy court then entered summary judgment in Springfield's favor and enjoined the SBA from denying Springfield PPP funds based on their status as debtors in bankruptcy. The SBA appealed. We hold, based upon the plain language of Section 525(a), that the PPP is a loan guaranty program and not an "other similar grant," and Section 525(a) does not apply to the PPP. Therefore, the bankruptcy court incorrectly ruled that Springfield was entitled to summary judgment and a permanent injunction, and we instead conclude, as a matter of law, that summary judgment in the SBA's favor is warranted on the Section 525(a) claim.

Accordingly, we **REVERSE** the judgment, **VACATE** the permanent injunction, and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

> JOSHUA M. SALZMAN (Mark B. Stern, Lindsey Powell, *on the brief*), Appellate Staff, Civil Division, *for* Brian M.

Boynton, Acting Assistant Attorney General, United States Department of Justice, Washington, DC, and Jonathan A. Ophardt, Acting United States Attorney for the District of Vermont, Burlington, VT, *for Defendant-Appellant*.

ANDREW C. HELMAN, Dentons Bingham Greenebaum LLP, Portland, ME, *for Plaintiff-Appellee Springfield Hospital, Inc.*

Adam R. Prescott, D. Sam Anderson, Bernstein Shur Sawyer & Nelson, P.A., Portland, ME, *for Plaintiff-Appellee Springfield Medical Care Systems, Inc.*

JOSEPH F. BIANCO, *Circuit Judge*:

In March 2020, in response to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act" or the "Act"), which established the Paycheck Protection Program ("PPP"). The PPP authorized the Small Business Administration (the "SBA") to guarantee favorable and potentially forgivable loans to businesses negatively impacted by the pandemic. In administering the program, the SBA decided to automatically bar any applicant who was a debtor in bankruptcy from receiving PPP funds.

Plaintiffs-Appellees Springfield Hospital, Inc. and Springfield Medical Care Systems, Inc. (together, "Springfield")[1] are debtors in bankruptcy who applied for and were denied PPP funds due solely to their bankruptcy status. In April 2020, Springfield initiated this adversary proceeding in bankruptcy court against Defendant-Appellant, the Administrator of the SBA, in her official capacity, challenging the SBA's administration of PPP funds and requesting that the bankruptcy court enjoin the SBA from denying any PPP application on the sole basis of the applicant's bankruptcy status. Specifically, Springfield asserted that: (1) the SBA's decision to exclude bankrupt debtors from obtaining PPP loans violated Section 525(a) of the Bankruptcy Code, which provides that "a governmental unit may not deny . . . a license, permit, charter, franchise, or other similar grant" to a debtor in bankruptcy solely because of that status, 11 U.S.C. § 525(a); and (2) the SBA is not immune from injunctive relief under the Small Business Act, 15 U.S.C. § 634(b)(1).

---

[1] Springfield Hospital, Inc. and Springfield Medical Care Systems, Inc. commenced separate suits, which were never formally consolidated in the bankruptcy court. The suits are substantially similar for all relevant purposes and were resolved jointly through an opinion and order cross-filed in both cases. On motion to this Court, we consolidated the two cases for appeal and we refer to them as a singular entity for the remainder of this opinion.

4

On June 22, 2020, the Bankruptcy Court for the District of Vermont (Brown, *J.*) issued a Memorandum of Decision, concluding that, as a matter of law, PPP funds were "other similar grant[s]" under Section 525(a) and granting summary judgment in Springfield's favor. Further, the bankruptcy court concluded that Section 634(b)(1) did not bar it from enjoining the SBA and, after determining that Springfield had met the standard to obtain a permanent injunction, enjoined the SBA from denying Springfield PPP funds based on its bankruptcy status. The SBA appealed.

We hold, based upon the plain language of Section 525(a), that the PPP is a loan guaranty program and not an "other similar grant," and that Section 525(a) does not apply to PPP loans. Therefore, the bankruptcy court incorrectly ruled that Springfield was entitled to summary judgment and a permanent injunction, and we instead conclude, as a matter of law, that the SBA is entitled to summary judgment on the Section 525(a) claim.

Accordingly, we **REVERSE** the judgment, **VACATE** the permanent injunction, and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.

## BACKGROUND

## I.     Statutory and Regulatory Background

### A.      *Pre-CARES Act Statutory Context*

The SBA was enacted in 1958 to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns."  Pub. L. No. 85-536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. § 631(a), *et seq.*); *see also* 15 U.S.C. § 633(a) (establishing the SBA).  The SBA's primary mechanism for aiding small businesses is by financing private "Section 7(a) loans" under the Small Business Act.  *See* 15 U.S.C. § 636(a).  Although the SBA guarantees these loans, they are typically issued by private lenders rather than through direct disbursals from the SBA.  *Id.*; *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979).  By statute, Section 7(a) loans are subject to a "sound value" requirement—namely, that "[a]ll loans made under [Section 7(a)] shall be of such sound value or so secured as reasonably to assure repayment[.]"  15 U.S.C. § 636(a)(6).

In addition to creating Section 7(a) loans, the Small Business Act authorizes the SBA Administrator to "make such rules and regulations as [s]he deems necessary" to implement the loan program.  *See* 15 U.S.C. § 634(b)(6); *id.* § 634(b)(7) (vesting the SBA Administrator with the authority to create rules and "take any

6

and all actions . . . when [s]he determines such actions are necessary or desirable in making, servicing, . . . or otherwise dealing with or realizing on loans made under the provisions of [the Act]"). Accordingly, the SBA has promulgated several rules to ensure that Section 7(a) loans, consistent with the "sound value" mandate, are sufficiently creditworthy and assured of repayment. *See, e.g.*, 13 C.F.R. § 120.150 (2022). In evaluating creditworthiness, the SBA considers various factors, including the "credit history of the applicant," the "[s]trength of the business," its "projected cash flow," and the applicant's "[a]bility to repay the loan with earnings from the business." *Id.* § 120.150(a)–(i). Additionally, as part of the creditworthiness inquiry, the SBA considers the bankruptcy status and history of each applicant, although a status or history of bankruptcy does not automatically render an applicant ineligible for a Section 7(a) loan. *See* SMALL BUS. ADMIN., SBA 7A BORROWER INFORMATION FORM 1919, https://www.sba.gov/sites/default/files/2021-12/Form%201919_10-21-2020-rev-1_lt-508.pdf; *see also* Standard Operating Procedure, § 50 10 5(K), Small Bus. Admin., Lender and Development Company Loan Programs 178–80 (Apr. 1, 2019), https://www.sba.gov/sites/default/files/2019-02/SOP%2050%2010%205%28K%29%20FINAL%202.15.19%20SECURED%20copy

%20paste.pdf (outlining capital underwriting and capital analysis requirements for Section 7(a) loans).

## B. *COVID-19 and the CARES Act*

In March 2020, in response to the COVID-19 pandemic, Congress enacted the CARES Act to, in part, alleviate the pandemic's substantial economic effects on small businesses. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub L. No. 116-136, 134 Stat. 281, 286 (2020). Relevant here, Section 1102 of the Act establishes the PPP, a temporary program targeted at providing small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed. *See* CARES Act § 1102, 134 Stat. at 286 (codified as amended at 15 U.S.C. § 636(a)(36)). The PPP provides potentially forgivable loans to eligible small businesses, allowing the recipient to seek loan forgiveness if at least 60% of the loaned funds are used for specified expenses, such as payroll. *See id.* § 636(a)(36); *id.* § 636m(b)–(d). However, unauthorized uses of PPP funds, as well as certain authorized uses, are ineligible for loan forgiveness. *Compare id.* § 636(a)(36)(F) (detailing authorized uses), *with id.* § 636m(b) (detailing forgiveness-eligible uses). Congress initially authorized $349 billion in PPP loan commitments, but, after those funds were quickly depleted, added another $310

billion one month later and eventually extended a third round of PPP funding at the end of 2020. *See* CARES Act § 1102(b), 134 Stat. at 293; Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620, 620 (2020); *see* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 311, 134 Stat. 1182, 2001–07 (2020).

Rather than establishing the PPP as a standalone program, the CARES Act places the PPP under Section 7(a) of the Small Business Act, providing that the SBA "may guarantee covered [PPP] loans under the same terms, conditions, and processes" as other Section 7(a) loans.[2] 15 U.S.C. § 636(a)(36)(B); *see* CARES Act § 1102, 134 Stat. at 286 (amending "Section 7(a) of the Small Business Act"); *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 224 (2d Cir. 2021) (acknowledging the PPP's placement under Section 7(a)). The Act relaxed many of the Section 7(a) eligibility criteria for PPP applicants and waived some of the standard Section 7(a) requirements altogether. 15 U.S.C. §§ 636(a)(36)(D), (H)–(J),

---

[2] This was not an unusual framework for Congress to adopt, as it has, on multiple occasions, created specialized Section 7(a) loan programs and has modified or eliminated the standard Section 7(a) requirements for those loans. *See, e.g.*, Small Business Reauthorization and Manufacturing Assistance Act of 2004, Pub. L. No. 108-447, § 101(a), 118 Stat. 3441, 3442 (codified as amended at 15 U.S.C. § 636(a)(31)) (creating an express loan program and limiting the maximum loan amount to $500,000); Military Reservist and Veteran Small Business Reauthorization and Opportunity Act of 2008, Pub. L. No. 110-186, § 208, 122 Stat. 623, 631 (codified as amended at 15 U.S.C. § 636(a)(33)) (creating the increased veteran participation program and reducing the fees on veteran participation loans by 50%).

(R). However, the Act did not exempt PPP loans from Section 7(a)'s statutory "sound value" requirement.[3] *Id.* § 636(a)(6).

Given the need to move expeditiously to address the pandemic's economic effects, the CARES Act directed the SBA to issue emergency regulations implementing the PPP within only fifteen days.[4] CARES Act § 1114, 134 Stat. at 312 (codified as amended at 15 U.S.C. § 9012). In keeping with this statutory mandate, the SBA issued multiple rules implementing the PPP. The SBA's first interim final rule, which noted that "[t]he intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously . . . by . . . streamlining the requirements of the regular 7(a) loan program," waived the standard Section 7(a) creditworthiness inquiry and full underwriting requirements for PPP loans.[5] *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,811–12, 20,815 (Small Bus. Admin. Apr. 15, 2020) (waiving the

---

[3] PPP loans also share many other features with standard Section 7(a) loans, including, for instance, allowing borrowers to apply to and obtain PPP loans from private lending institutions, which then issue their own funds to qualifying borrowers, guaranteed by the SBA. *See, e.g.*, 15 U.S.C. § 636(a)(36)(F)(ii).

[4] To accomplish this expeditiously, Congress exempted the SBA from the standard rulemaking notice requirements. *See* CARES Act § 1114, 134 Stat. at 312 (codified as amended at 15 U.S.C. § 9012).

[5] Among other procedures, the SBA also established that PPP applicants must apply through approved lenders and that PPP funds are distributed on a "first-come, first-served" basis until the allocated funds are exhausted. *See* 85 Fed. Reg. at 20,812–13.

normal Section 7(a) criteria under 13 C.F.R. § 120.150); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program—Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21,747, 21,750 (Small Bus. Admin. Apr. 20, 2020) (describing the lack of underwriting requirements for the PPP). However, the SBA took other steps to follow its statutory "sound value" mandate, such as requiring that borrowers sign promissory notes specifying set interest rates and outlining key repayment terms. *See* 85 Fed. Reg. at 20,813 (establishing 1% interest rates and two-year maturation dates for PPP loans); *see* 85 Fed. Reg. at 20,814 (clarifying that "[i]f you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts"); *see* Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23,450, 23,450–52 (outlining promissory notes requirements) (Small Bus. Admin. Apr. 28, 2020).

Moreover, although the first interim final rule did not specify that all bankruptcy debtors were ineligible to receive PPP funds, it established the use of the PPP Application form, which asks applicants whether they are "presently involved in any bankruptcy" and provides that, if the applicant's answer is "'Yes,'

the loan will not be approved." SMALL BUS. ADMIN, PAYCHECK PROTECTION PROGRAM BORROWER APPLICATION FORM 2483 (VERSION 1), https://www.sba.gov/sites/default/files/2022-02/PPP-Borrower-Application-Form-Fillable.pdf; *see* 85 Fed. Reg. at 20,814 (establishing use of SBA Form 2483). In its fourth interim final rule, the SBA explicitly clarified that bankruptcy debtors are ineligible to receive PPP funds, explaining that "[t]he Administrator, in consultation with the Secretary [of the Treasury], determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans." *See* 85 Fed. Reg. at 23,451.

## II.     Procedural History

Springfield is a non-profit critical access hospital and medical services provider located in Springfield, Vermont, that employs over 670 employees. On June 26, 2019, Springfield commenced voluntary chapter 11 bankruptcy proceedings, but has continued to operate its businesses as a debtor-in-possession. After the onset of the COVID-19 pandemic, the majority of Springfield's outpatient procedures, non-essential medical procedures, and office visits were cancelled, postponed, or rescheduled pursuant to federal and state orders and

12

recommendations. As a significant portion of Springfield's revenue streams are derived from these services, the cancellations and postponements had a severe impact on Springfield's cash flow, materially exacerbating Springfield's already-existing financial problems. Due to this negative impact on its income, Springfield anticipated serious difficulties with paying its near-term operating expenses and consequently applied for multiple state and federal emergency grants, including, as relevant here, PPP loans.[6] At the time of its application, Springfield was in chapter 11 bankruptcy status. Because of this status, Springfield's PPP applications were denied.[7]

On April 27, 2020, Springfield filed suit in bankruptcy court in the District of Vermont against the SBA Administrator in her official capacity, alleging, *inter*

---

[6] Between April and May 2020, Springfield received approximately $5.6 million in federal stimulus funds for rural healthcare providers and borrowed approximately $498,800 in prospective Medicaid payments from the State of Vermont. Further, in May 2020, Springfield was informed it would receive a grant of approximately $531,000 from the federal government to expand its testing capabilities for COVID-19. By the time of the bankruptcy court's decision, these funds had mitigated Springfield's immediate risk of having to close the hospital and medical care centers, though Springfield's counsel represented at oral argument that the hospital system had to discontinue dental services in certain areas due to budget shortfalls. *See* Oral Arg. at 23:50–24:01.

[7] Springfield applied for PPP funds from private commercial lenders Berkshire Bank and Mascoma, both of which denied Springfield's applications on April 13, 2020 and April 30, 2020, respectively. Although the SBA's interim fourth rule had not been released at this time, the application denials were based upon SBA Form 2483 and additional guidance from the SBA. Neither party disputes that Springfield's applications were denied solely because of its status as a debtor in bankruptcy.

*alia*, that the SBA's administration of the PPP discriminated against Springfield in violation of Section 525(a) of the Bankruptcy Code, and seeking an order "enjoining SBA . . . from denying an application under PPP on the basis that the applicant is a debtor in bankruptcy."[8]  Joint App'x at 18–23.  In opposition, the SBA argued that (1) the PPP was a loan program not covered under Section 525(a), and (2) Springfield was unable to obtain injunctive relief due to SBA's sovereign immunity pursuant to Section 634(b)(1), which provides that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [SBA] Administrator or [her] property."  15 U.S.C. § 634(b)(1).  After an emergency hearing, the bankruptcy court granted Springfield a temporary restraining order, which was later extended through the duration of the proceedings.  Because the parties agreed there were no material facts in dispute with respect to the Section 525(a) claim asserted by Springfield, the bankruptcy court bifurcated the proceedings and directed the parties to proceed with briefing their motion for summary judgment on the Section 525(a) claim.

---

[8] In addition to its Section 525(a) claim and its request for injunctive relief to bar the SBA from denying its PPP application on the basis of its bankruptcy status, Springfield also sought: (1) declaratory relief that the "CARES Act requires its Application to be considered on the same terms as other qualified businesses that are not presently debtors"; (2) a writ of mandamus against the SBA Administrator to implement the PPP in a way that does not violate Section 525(a); and (3) damages in the event that injunctive relief is not granted and "it is later determined that [Springfield] was eligible for PPP funds but none remain available."  Joint App'x at 18–23.

On June 22, 2020, the bankruptcy court issued an order and accompanying Memorandum of Decision granting summary judgment in Springfield's favor and enjoining the SBA from denying Springfield's PPP application.[9] Specifically, the bankruptcy court held that: (1) *In re Goldrich*, 771 F.2d 28 (2d Cir. 1985)—the controlling precedent cited by the SBA, which held that Section 525(a) did not protect extensions of credit—had been overruled by congressional abrogation and a later circuit decision; (2) regardless, the PPP was an "other similar grant" within the meaning of Section 525(a), not a loan program, and thus, the SBA's exclusion of debtors in bankruptcy from the PPP violated Section 525(a); (3) Section 634(b)(1) did not bar an injunction against the SBA and, accordingly, the bankruptcy court could enjoin the SBA from taking any action that would violate Section 525(a); and (4) Springfield had met the necessary standard to obtain a permanent injunction.

---

[9] The bankruptcy court issued a detailed permanent injunction that not only enjoined the SBA (and the relevant participating commercial lenders) from denying Springfield's PPP application, but also required that the enjoined parties treat May 15, 2020 as the date on which Springfield received the PPP funds and as the start of the "covered period," as defined under the CARES Act, even though Springfield would not actually receive any PPP funds until a later date. The injunction also specified that Springfield would submit its PPP forgiveness applications at the end of the covered period, clarifying that "[t]his fictional approval date is necessary to protect the rights of the Enjoined Parties and is consistent with the stay of certain crucial deadlines." Special App'x at 40. The bankruptcy court further outlined that "[u]pon entry of a final order . . . that is not subject to further appeal . . . the Enjoined Parties shall promptly disburse the PPP funds to Plaintiffs." Special App'x at 41.

15

This appeal followed.[10]

## III. PPP Litigation under Section 525(a) in Other Courts

Around the same time as the instant action, numerous challenges to the SBA's exclusion of bankrupt debtors from the PPP were brought in federal courts around the country. When the bankruptcy court issued its order that is the subject of the instant appeal, it identified multiple recent PPP-related decisions addressing Section 525(a) in both bankruptcy courts and district courts.[11] Of the proceedings that reached a decision by the time the bankruptcy court issued its order, at least fourteen courts had concluded—either directly or by determining that the plaintiffs were unlikely to succeed on the merits—that the PPP was not covered

_____

[10] After the bankruptcy court issued its order, the SBA sought to have the decision reviewed by the district court in the first instance. However, on July 31, 2020, in response to Springfield's request, the bankruptcy court entered an order certifying its decision for direct appeal to this Court pursuant to 28 U.S.C. § 158(d)(2), which permits direct appeal of a bankruptcy court order or judgment to the appropriate court of appeals, providing the court of appeals permits, "if the bankruptcy court certifies that either '(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision . . . or involves a matter of public importance; (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case." *Weber v. United States Tr.*, 484 F.3d 154, 157 (2d Cir. 2007) (quoting 28 U.S.C. § 158(d)(2)(A)(i)–(iii)). On November 19, 2020, we concluded that the bankruptcy court's order satisfied Section 158(d)(2) and authorized this appeal.

[11] Although the bankruptcy court referenced thirty-four PPP-related cases, we reference only the cases that decided the Section 525(a) issue, as some cases were voluntarily dismissed and many were decided on, *inter alia*, claims brought under the Administrative Procedure Act ("APA").

by Section 525(a).[12]  We note that one such case was brought in the Western District of New York.  The district court ultimately granted summary judgment to the SBA on the Section 525(a) claim and thus created a split of authority among lower courts within this circuit.  *See Diocese of Rochester*, 466 F. Supp. 3d at 379–80 (holding that the PPP was a "loan" not covered by Section 525(a)).  In contrast, six courts concluded that Section 525(a) *did* extend to the PPP.[13]  Since the bankruptcy

---

[12] *Cosi, Inc. v. U.S. Small Bus. Admin.*, Adv. Proc. No. 20-50591 (BLS) (Bankr. D. Del. April 30, 2020); *Trudy's Texas Star, Inc. v. Carranza*, Adv. Proc. No. 20-ap-01026-hcm (Bankr. W.D. Tex. May 7, 2020); *Breda, LLC v. Carranza*, Adv. Proc. No. 20-ap-01008 (Bankr. D. Me. May 11, 2020); *Asteria Educ., Inc. v. Carranza*, Adv. Proc. No. 20-ap-05024-cag (Bankr. W.D. Tex. May 14, 2020); *Weather King Heating & Air, Inc. v. U.S. Small Bus. Admin.*, Adv. Proc. No. 20-ap-05023-amk (Bankr. N.D. Ohio May 21, 2020); *Schuessler v. U.S. Small Bus. Admin*, Adv. Proc. No. 20-02065-bhl, 2020 WL 2621186, at *9 (Bankr. E.D. Wi. May 22, 2020); *Starplex Corp. v. Carranza*, Adv. Proc. No. 20-ap-00095-DPC (Bankr. D. Ariz. May 26, 2020); *Matter of Henry Anesthesia Assocs. LLC*, Adv. Proc. No. 20-06084-LRC, 2020 WL 3002124, at *5–6 (Bankr. N.D. Ga. June 4, 2020); *iThrive Health, LLC v. Carranza*, 623 B.R. 392, 401–02 (Bankr. D. Md. 2020); *Diocese of Rochester v. U.S. Small Bus. Admin*, 466 F. Supp. 3d 363, 370 (W.D.N.Y. 2020); *USA Gymnastics v. U.S. Small Bus. Admin.*, Adv. Proc. No. 20-ap-50055 (Bankr. S.D. Ind. June 12, 2020), *aff'd* 2020 WL 4932233, at *1–2 (S.D. Ind. June 22, 2020); *PCT Int'l, Inc. v. U.S. Small Bus. Admin.*, Adv. Proc. No. 20-ap-00118-PS (Bankr. D. Ariz. June 12, 2020); *Fox Valley Pro Basketball, Inc. v. U.S. Small Bus. Admin.*, Case No. 20-C-793, 2020 U.S. Dist. LEXIS 105355, at *2 (E.D. Wi. June 16, 2020); *In re Penobscot Valley Hosp.*, Adv. Proc. No. 20-1005, 2020 WL 3032939, at *10–16 (Bankr. D. Me. June 3, 2020), *adopted in part*, 620 B.R. 1 (D. Me. 2020).

[13] *In re Hidalgo Cty. Emergency Serv. Found.*, Adv. Proc. No. 20-2006, 2020 WL 2029252, at *1 (Bankr. S. D. Tex. Apr. 25, 2020), *rev'd* 962 F.3d 838 (5th Cir. 2020); *In re Organic Power LLC*, 619 B.R. 540, 550 (Bankr. D. P.R. 2020); *KP Eng'g LP v. U.S. Small Bus. Admin.*, Adv. Proc. No. 20-ap-03120 (Bankr. S.D. Tex. May 18, 2020) (preliminary injunction entered on May 18, 2020, adversary proceeding dismissed as moot by agreement of the parties on June 30, 2020); *St. Alexius Hosp. Corp. #1 v. Carranza*, Adv. Proc. No. 20-ap-06005-grs (Bankr. E.D. Ky. May 22, 2020) (subsequently voluntarily dismissed without prejudice); *Roman Catholic Church of the Archdiocese of Santa Fe v. U.S. Small Bus. Admin.*, 615 B.R. 644, 656–57 (Bankr. D. N.M. 2020); *In re Skefos*, Adv. Proc. No. 20-00071, 2020 WL 2893413, at *16 (Bankr. W.D. Tenn. June 3, 2020).  One such decision was later

court's decision here, at least four additional courts have determined that Section 525(a) does not apply to the PPP, while no additional courts have determined that it does.[14]

In sum, at the time of this opinion's publication, approximately eighteen courts have determined that the PPP is not protected by Section 525(a). No circuit court, however, has addressed this precise issue.

## IV.    Post-CARES Act Congressional Action

On December 27, 2020, Congress enacted the Consolidated Appropriations Act 2021, Pub L. No. 116-260, 134 Stat. 1182 (2020). As relevant here, the Consolidated Appropriations Act amended Section 525 to prohibit the exclusion of debtors in bankruptcy from certain benefits under the CARES ACT—namely, foreclosure moratoriums, eviction moratoriums, and the forbearance of some residential mortgages—solely based on their status as debtors in bankruptcy. *See*

---

reversed on grounds other than the Section 525(a) claim. *See In re Hidalgo Cty. Emergency Serv. Found.*, 962 F.3d at 840–41 (reversing the bankruptcy court on the grounds that, per Fifth Circuit precedent, the SBA had sovereign immunity from injunctive relief under Section 634(b)(1), and thus had been improperly enjoined).

[14] *See In re Dancor Transit*, No. Case No. 2:20-bk-70536, 2020 WL 4730896, at *7–8 (Bankr. W.D. Ark. June 22, 2020); *Tradeways, Ltd. v. U.S. Dep't of the Treasury*, Case No. ELH-20-1324, 2020 WL 3447767, at *16 (D. Md. June 24, 2020); *In re Vestavia Hills, Ltd.*, 630 B.R. 816, 848–49 (S.D. Cal. 2021); *Archbishop of Agaña v. U.S. Small Bus. Admin*, Adv. Proc. No. 20-00002, 2021 WL 1702311, at *8 (D. Guam Feb. 23, 2021).

11 U.S.C. § 525(d) ("A person may not be denied relief under sections 4022 through 4024 of the CARES Act (15 U.S.C. 9056, 9057, 9058) because the person is or has been a debtor under this title."). Notably, this amendment did not include PPP in the list of covered benefits, nor did it alter the text of Section 525(a). Additionally, the Consolidated Appropriations Act included provisions continuing the PPP through the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"), which extended the SBA's authority to make PPP loans through March 31, 2021, and provided a mechanism for certain bankrupt debtors to seek and obtain approval for PPP loans.[15] *See* Pub. L. No. 116-260, div. N, tit. III, 134 Stat. at 1993 (Economic Aid Act), 2019 (extension to March 31). Springfield does not argue that it could qualify for PPP loans under the Economic Aid Act.

## DISCUSSION

On appeal, the SBA contends that the bankruptcy court erred in concluding that Section 525(a) applied to the PPP. Specifically, the SBA asserts that our precedent in *Goldrich* establishes that extensions of credit are not protected by Section 525(a) and argues that the bankruptcy court erred by (1) reasoning that

---

[15] Section 320 of the Economic Aid Act empowers bankruptcy courts to, effective only upon approval of the SBA Administrator, authorize debtors under specific categories of bankruptcy to obtain a PPP loan. Economic Aid Act §§ 320, 320(f), Title III of Div. N of Pub. L. No. 116-260, 134 Stat. 1182, 2015–16 (2020).

19

*Goldrich* was no longer viable precedent, and (2) concluding that the PPP was a grant program covered under Section 525(a), not an uncovered loan guarantee program. Additionally, the SBA contends that the bankruptcy court lacked authority to enjoin the SBA's policy because of the injunction bar in Section 634(b)(1).

We review *de novo* a bankruptcy court's grant of summary judgment. *See In re Treco*, 240 F.3d 148, 155 (2d Cir. 2001). A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir. 2009). Where the grant of summary judgment "presents only a legal issue of statutory interpretation . . . we review *de novo* whether the district court correctly interpreted the statute." *Hayward v. IBI Armored Servs., Inc.*, 954 F.3d 573, 575 (2d Cir. 2020) (internal quotation marks omitted).

Moreover, when reviewing an order granting a permanent injunction, we review the lower court's conclusions of law *de novo* and its ultimate decision for abuse of discretion. *Goldman, Sachs & Co v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014). An abuse of discretion occurs when the lower court's

20

decision rests on a clearly erroneous factual finding or an error of law or cannot be located within the range of permissible decisions. *ACORN v. United States*, 618 F.3d 125, 133 (2d Cir. 2010).

As discussed below, we hold that, as a matter of law, the PPP is a loan guaranty program and not an "other similar grant," and thus is not covered by Section 525(a). Accordingly, the bankruptcy court erred in interpreting the statute and granting summary judgment in Springfield's favor on the Section 525(a) claim. Instead, we conclude, as a matter of law, that the SBA is entitled to summary judgment on the Section 525(a) claim. Moreover, because we conclude that Springfield's claim fails on the merits, we vacate the permanent injunction and decline to address whether the SBA has sovereign immunity from injunctive relief under Section 634(b)(1).[16]

---

[16] The SBA argues that the plain terms of the statute bar all injunctive relief against it, whereas Springfield argues that the SBA's reading is too narrow and disregards the context of the surrounding terms in the provision. Our sister circuits are split on Section 634(b)(1)'s reach. *Compare Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir. 1987) (holding that Section 634(b)(1) does not immunize the SBA from injunctions barring "agency actions that exceed agency authority," as long as the injunction "would not interfere with internal agency operations"), *with Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 n.6 (5th Cir. 1994) ("[A]ll injunctive relief directed at the SBA is absolutely prohibited." (internal quotation marks omitted)), *and J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("[C]ourts have no jurisdiction to award injunctive relief against the SBA."). We have not yet addressed this issue and decline to do so here.

## I. Sovereign Immunity and Injunctive Relief

Before we analyze Springfield's Section 525(a) claim, we must briefly address whether there is a threshold question of federal sovereign immunity, relating to the availability of injunctive relief in this case, that we must first consider before reaching the merits of the case.

Issues of federal sovereign immunity implicate a court's subject-matter jurisdiction, *see Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007), and, as such, are usually threshold issues that must be decided before proceeding to the merits of a given case, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). However, as we have frequently held, there is a distinct difference between jurisdictional questions of a statutory nature and jurisdictional questions of a constitutional nature. *See, e.g.*, *Butcher v. Wendt*, 975 F.3d 236, 242 (2d Cir. 2020) (describing *Steel Co.*'s differentiation between constitutional and statutory jurisdiction and explaining that "[t]he bar on hypothetical jurisdiction, we have held, applies only to questions of Article III jurisdiction" (internal quotation marks omitted)). When a jurisdictional issue is statutory in nature, we are not required to follow a strict order of operations but instead may proceed to dismiss the case on the merits rather than engage with the jurisdictional question, particularly

when the jurisdictional issue is complex and the merits are straightforward. *See, e.g.*, *id.* (collecting cases); *Conyers v. Rossides*, 558 F.3d 137, 150 (2d Cir. 2009) (declining to decide a question of federal sovereign immunity where "the question [was] one of statutory rather than constitutional jurisdiction" and instead, "assum[ing] hypothetical jurisdiction" and "proceed[ing] to address the alternative argument for dismissal offered"); *Ivanishvili v. U.S. Dep't of Just.*, 433 F.3d 332, 338 n.2 (2d Cir. 2006) ("Our assumption of jurisdiction to consider first the merits is not barred where the jurisdictional constraints are imposed by statute, not the Constitution, and where the jurisdictional issues are complex and the substance of the claim is, as here, plainly without merit.").

Moreover, federal sovereign immunity differs from standard threshold matters of Article III jurisdiction in that it can be consented to or waived. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("*Absent a waiver,* sovereign immunity shields the Federal Government and its agencies from suit." (emphasis added)); *cf. Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("[T]he Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it."

23

(internal citations omitted)). Other circuits have held that a court is not required to decide the issue of federal sovereign immunity before reaching the merits. *See, e.g.*, *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255 n.7 (11th Cir. 2020); *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1000–01 (D.C. Cir. 1999). *But see In re Hidalgo Cty. Emergency Serv. Found.*, 962 F.3d at 840–41 (concluding that the bankruptcy court "exceeded its authority" under "well-established Fifth Circuit law," and vacating the preliminary injunction against the SBA).

Here, we similarly conclude that the question of the SBA's sovereign immunity under Section 634(b)(1), related to the issue of the availability of injunctive relief, is not a threshold question we must decide before holding that the Section 525(a) claim fails on the merits. First, it is clear to us that we have jurisdiction over the merits of the underlying dispute. Section 106 of the Bankruptcy Code—entitled "Waiver of sovereign immunity"—expressly abrogates sovereign immunity with respect to Section 525, among other provisions, and provides that a "court may hear and determine any issue arising with respect to the application of such sections to governmental units." 11 U.S.C. § 106(a)(1)–(2); *see F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012) ("[A] waiver of sovereign immunity must be unequivocally expressed in statutory text." (internal

24

quotation marks omitted)). Further, Section 634(b)(1)'s own text provides that "[t]he [SBA] may . . . sue and be sued . . . in any United States district court." 15 U.S.C. § 634(b)(1).

Thus, the SBA has *not* asserted immunity from suit. Instead, the SBA concedes that the Bankruptcy Code waives its sovereign immunity, albeit in a limited fashion, and agrees that the question of its immunity from injunctive relief under Section 634(b)(1) is not a threshold issue that we must decide before we reach the merits. In other words, the SBA is not asserting sovereign immunity as a defense against suit—it is merely raising sovereign immunity as a defense against one particular form of *relief*.[17] As such, we do not view the Section 634(b)(1)

---

[17] The SBA's litigation position appears to be what some circuits have termed a "conditional" assertion of sovereign immunity—essentially, when a state or federal governmental unit waives sovereign immunity as to the greater lawsuit but reserves the right to raise immunity as a defense if it loses on the merits. *See McClendon v. Ga. Dep't of Comm. Health*, 261 F.3d 1252, 1258 (11th Cir. 2001). Conditional assertions of immunity, essentially a jurisdictional argument in the alternative, have led some courts to conclude that there is no need to decide the jurisdictional question before reaching the merits. *See, e.g.*, *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1137 (11th Cir. 2019) ("Because sovereign immunity can be waived, our precedent allows us to 'bypass' the threshold question whether an entity is entitled to sovereign immunity where it only conditionally asserts the defense." (internal quotation marks and alterations omitted)); *Floyd v. Thompson*, 227 F.3d 1029, 1035 (7th Cir. 2000) (concluding the court could bypass a complex Eleventh Amendment issue because "the Eleventh Amendment occupies its own unique territory" and "[u]nlike basic subject matter jurisdiction, which can never be stipulated or waived, a state is entitled to waive its Eleventh Amendment immunity from suit if it so desires"); *cf. Parella v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 173 F.3d 46, 55 (1st Cir. 1999) ("[B]ecause Eleventh Amendment immunity can be waived, the presence of an Eleventh Amendment issue does not threaten the

25

question of whether an injunction *can* be issued against the SBA as a threshold question that we must decide before we even determine whether an injunction *should* be issued against the SBA. This is especially true where, as here, the plaintiffs seek other forms of relief, such as damages and declaratory relief, as to which no sovereign immunity issue exists. To hold otherwise would require a court to decide a statutory jurisdictional issue related only to one particular form of relief being sought even before deciding whether the party is entitled to any relief at all. We see no legal basis to impose such a stringent requirement here and, accordingly, proceed to discuss the merits of the Section 525(a) claim.[18]

---

court's underlying power to declare the law."). *But see United States v. Tx. Tech Univ.*, 171 F.3d 279, 285–86 (5th Cir. 1999) ("It is the Eleventh Amendment's restraint on 'Judicial power' that requires us to confront the Eleventh Amendment before employing our power to interpret statutory text.").

[18] Moreover, in the near-analogous Eleventh Amendment context, we have similarly declined to engage in a complex jurisdictional analysis when a straightforward basis of decision was available, thereby avoiding unnecessary issues. *See, e.g., Donohue v. Cuomo*, 980 F.3d 53, 77 n.15 (2d Cir. 2020); *Nat'l R.R. Passenger Corp. v. McDonald*, 779 F.3d 97, 100 (2d Cir. 2015); *Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 431 (2d Cir. 2004); *Tyler v. Douglas*, 280 F.3d 116, 121 (2d Cir. 2001). To be sure, on at least one other occasion, we insisted upon examining the immunity question before reaching the merits of the claim. *See Hale v. Mann*, 219 F.3d 61, 66–67 (2d Cir. 2000). However, in that instance, the state entity in question asserted sovereign immunity from suit entirely, contending that Congress had not validly abrogated the state's sovereign immunity with the Family Medical Leave Act. *Id.* at 66–69. Here, in contrast, the SBA does not contend that it is immune in general, merely that it is immune from injunctive relief.

## II.    Section 525(a)

To establish a violation of Section 525(a), Springfield must demonstrate that: (1) the SBA is a governmental unit; (2) the PPP is covered by the statute; and (3) the SBA discriminated against Springfield solely because of its status as a debtor in bankruptcy.  11 U.S.C. § 525(a).  As the SBA is unquestionably a governmental unit as defined in Title 11,[19] and as the parties do not dispute that Springfield was excluded from the PPP solely based upon its bankruptcy status, the only question before us is whether, as a matter of law, the PPP is a "license, permit, charter, franchise, or other similar grant" covered under Section 525(a).  We conclude that it is not.  As set forth below, our conclusion is supported by the plain text of the statute, our prior precedent, and subsequent congressional action after the passage of the CARES Act.

### A.    *The Text of Section 525(a)*

Our analysis begins, as it must, with the plain text of Section 525(a).  *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then . . . [the] 'judicial inquiry is complete.'" (quoting *Rubin v.*

---

[19] The Bankruptcy Code defines a "governmental unit" as "[the] United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  11 U.S.C. § 101(27).

*United States*, 449 U.S. 424, 430 (1981))); *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). In looking at a statute's plain meaning, we also must consider the context in which the statutory terms are used, as "[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984); *Saks v. Franklin Covey Co.,* 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.").

The meaning of Section 525(a) is plain. Section 525(a) provides, in relevant part, that "a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to . . . a bankrupt or a debtor under the Bankruptcy Act . . . solely because such bankrupt or debtor is or has been . . . a bankrupt or debtor under the Bankruptcy Act." 11 U.S.C § 525(a). The statute's plain text clearly delineates that its protections extend only to specific, enumerated benefits or interests. As the parties appear to agree (and we independently conclude) that the PPP is not a "license," "permit," "charter," or "franchise," we focus our inquiry solely upon "grant."

28

Because "grant" is undefined, we give the term its ordinary meaning, considering the "commonly understood meaning of the statute's words at the time Congress enacted the statute, and with a view to their place in the overall statutory scheme." *In re Bernard L. Madoff Inv. Secs. LLC*, 12 F.4th 171, 186 (2d Cir. 2021) (internal quotation marks omitted).  In legal terms, a grant is "[a]n agreement that creates a right or interest in favor of a person or that effects a transfer of a right or interest from one person to another."  *Grant*, Black's Law Dictionary (11th ed. 2019).  This does not mean, however, that any governmental agreement or transfer creating a right or interest in another person's favor is entitled to protection under Section 525(a).  Instead, pursuant to the canon of construction *noscitur a sociis*, the words "other" and "similar" restrict the scope of protected grants to only those that conceivably resemble the other listed terms in the statute—licenses, permits, charters, and franchises.  *See Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 604 (2d Cir. 2021) (stating that *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated" (internal quotation marks omitted)).  Although the exact nature of this resemblance is not articulated in the statute, the plain language of the terms, as well as our precedent, suggest that these interests all share two common qualities: they are (1) "unobtainable

29

from the private sector" and (2) "essential to a debtor's fresh start." *Stoltz v. Brattleboro Hous. Auth. (In re Stoltz)*, 315 F.3d 80, 90 (2d Cir. 2002).

Thus, two things are clear from this analysis of the statute's plain language. First, given the textual limitations on the listed items in the statute, it is evident that credit guarantees—in other words, loans—are *not* covered by the provision. As we held in *Goldrich*, "[a] credit guarantee is not a license, permit, charter or franchise; nor is it in any way similar to those grants. . . . Although the exact scope of the items enumerated may be undefined, the fact that the list is composed solely of benefits conferred by the state that are unrelated to credit is unambiguous." 771 F.2d at 30. Second, the text makes plain that it is insufficient for an item to fall within the general definition of "grant" to qualify for protection under Section 525(a). Instead, protection is only extended to those governmental grants that possess the two qualities we have identified as shared among the other listed terms. *See Stoltz*, 315 F.3d at 90. Before we can apply these two principles to the PPP, however, we must address in more detail the parties' dispute over our precedent regarding the scope of Section 525(a), including Springfield's contention that *Goldrich* is no longer good law.

**B.** *Our Precedent*

The parties dispute which of our two Section 525(a) cases—*Goldrich* or *Stoltz*—controls the instant issue. The bankruptcy court described these cases as presenting "markedly different analyses of [Section] 525(a)" and ultimately concluded that *Stoltz* marked our clear "departure from—and disproval of" our earlier analysis in *Goldrich*. Special App'x at 13, 17. We disagree.

Section 525 evolved from *Perez v. Campbell*, 402 U.S. 637 (1971), a bankruptcy case in which the Supreme Court held that a state law conditioning the reinstatement of a driver's license on the repayment of a debt—despite that debt having been discharged in bankruptcy—conflicted with the Bankruptcy Code's "policy of a fresh start for a debtor." S. Rep. No. 95-989, at 81 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5867; *see also Goldrich*, 771 F.2d at 30 (recognizing Congress's codification of *Perez*); *Stoltz*, 315 F.3d at 87 (same). Notwithstanding this "fresh start" policy, when we first examined Section 525 in *Goldrich*, we held that the provision did not extend so far as to cover a New York student loan guaranty program. *Goldrich*, 771 F.2d at 30. In reaching this holding, we relied upon the provision's plain language, reasoning that "[h]ad Congress intended to extend this section to cover loans or other forms of credit, it could have included

31

some term that would have supported such an extension." *Id.* Thus, we concluded that "Congress' failure to manifest any intention to include items of a distinctly different character" was unambiguous. *Id.* Further, we noted that, although the legislative history could be interpreted to "allow expansion" of Section 525(a), that same legislative history also indicated "that such expansion would be limited to situations sufficiently similar to *Perez* to fall within the enumeration," and, accordingly, we refused to stretch Section 525(a) "so far beyond the limits set by Congress."[20] *See id.* at 30–31. Our reasoning was soon adopted by two other circuit courts, which likewise concluded that Section 525 did not cover loans or other programs dissimilar to the enumerated items. *See Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090, 1093–94 (3d Cir. 1989) (holding that the unambiguous text of Section 525 did not cover an emergency mortgage assistance loan); *In re Exquisito Servs., Inc.*, 823 F.2d 151, 153–154 (5th Cir. 1987) (adopting the "narrow construction" of Section 525(a) outlined in *Goldrich* to limit the provision "only to situations analogous to those enumerated in the statute").

---

[20] In *Goldrich*, we recognized that there was no need to examine Section 525's legislative history, given our determination that the statute was unambiguous. *Id.* at 30. However, as the lower court relied heavily on legislative history in reaching its conclusion that the provision *did* cover student loans, we were prompted to comment upon it. *Id.*

Nine years after our decision in *Goldrich*, Congress amended Section 525 to include a subsection prohibiting discrimination against debtor-borrowers by any "governmental unit that operates a student grant or loan program." 11 U.S.C. § 525(c). Notably, however, Congress left the plain text of Section 525(a) untouched. Following this amendment, multiple circuits continued to follow *Goldrich*'s reasoning, concluding that the amendment had narrowly abrogated *Goldrich's* specific holding as to *student* loans but had not abrogated its broader holding that Section 525(a) did not cover loans in general. *See Ayes v. U.S. Dep't of Veterans Affs.*, 473 F.3d 104, 109–11 (4th Cir. 2006) (holding that a veteran home-loan guaranty entitlement is not an "other similar grant" under § 525(a) and stating that, although Section 525(c) "clearly abrogated *Goldrich's* specific holding[,] . . . [t]here is, however, no indication in the language of [Section] 525(c) that Congress also intended the section to apply to other kinds of loan guaranties besides those of the student loan variety"); *Toth v. Mich. State Hous. Dev. Auth.*, 136 F.3d 477, 479–80 (6th Cir. 1998) (holding that a government home improvement loan is not covered by Section 525(a) and agreeing that, even after the enactment of Section 525(c), the statutory provision "[does] not prohibit consideration of prior bankruptcies in credit decisions, since 'the language of section 525 may not

33

properly be stretched so far beyond its plain terms'" (quoting *Goldrich*, 771 F.2d at 29)).

When we next considered the scope of Section 525(a) in *Stoltz*, we concluded that a public housing lease qualified as a "similar grant," reasoning that it shared the two common qualities as the other items listed in the statute: first, it was, by definition, unobtainable in the private sector, and second, it was essential to a debtor-tenant's fresh start, as without it the debtor could "quite possibly become homeless." *Stoltz*, 315 F.3d at 90. Although we relied upon the plain text of the statute in reaching our conclusion, as in *Goldrich*, we also briefly noted that the legislative history supported our reasoning, as portions of that history "specifically reject[] a narrow construction of the antidiscrimination provision and make[] clear that 525(a) protects the debtor's fresh start." *Id*. at 92 n.6.

Notwithstanding the ability to harmonize the analysis in these two decisions, the bankruptcy court determined—and Springfield argues on appeal—that *Goldrich* no longer carries authoritative weight because it was, alternatively, abrogated by congressional enactment or overruled by our subsequent opinion in *Stoltz*. We find these arguments unpersuasive and address each in turn.

First, although we recognized in *Stoltz* that Section 525(c) abrogated *Goldrich*'s specific holding as to student loans, we do not conclude that this abrogation nullified the rest of *Goldrich*'s analysis. For one thing, the plain text of Section 525(a) counsels against this conclusion. If Congress had intended Section 525 to reach all government loans, it could easily have revised Section 525(a) to do so. It did not. Instead, Congress enacted the ban on student loan discrimination as a separate section, Section 525(c), and left the text of Section 525(a) untouched. That Congress chose instead to amend the statute to cover student loans only, and no other loans, strongly suggests that other loans are not protected by Section 525(a) and that Congress made the deliberate choice to exclude them. *See Conn. Nat'l Bank*, 503 U.S. at 253–54 ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *cf. United States v. City of New York*, 359 F.3d 83, 98 (2d Cir. 2004) (applying the maxim *expressio unius est exclusio alterius*—the mention of one thing implies the exclusion of another—"when the statute identifies a series of two or more terms or things that should be understood to go hand in hand, thus raising the inference that a similar unlisted term was deliberately excluded" (internal quotation marks omitted)). Other circuit courts have reached a similar conclusion and have continued to

hold—even after the enactment of Section 525(c), which gave protection to debtors for student loans under Section 525(a)—that other extensions of credit are plainly outside the ambit of Section 525(a). *See, e.g.*, *Ayes*, 473 F.3d at 109–11 (describing *Goldrich* as the "lodestar in the [Section] 525(a) context"); *Toth*, 136 F.3d at 479–80 (adopting *Goldrich*'s reasoning).

Second, we disagree with the bankruptcy court's conclusion that *Stoltz* departed from *Goldrich*'s analysis. To start, *Stoltz* could not have overruled *Goldrich* even had it presumed to do so, as a subsequent panel "is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014) (internal quotation marks omitted). Moreover, nothing about the two decisions suggests that they are irreconcilable. In *Goldrich*, we addressed Section 525(a)'s applicability to loans; in *Stoltz*, we considered its applicability in the context of public housing. That we reached different answers regarding the scope of Section 525(a) does not mean that our respective analyses contradict each other—it simply means that we were asked the legal question in two different factual contexts and, accordingly, reached different conclusions. *Stoltz* scarcely engages with *Goldrich*, much less purports to overrule it, because of

36

the starkly different factual contexts presented by each case—that is, the public housing lease in *Stoltz* bore no resemblance to the student loan in *Goldrich*. Thus, although the bankruptcy court suggests that *Stoltz's* limited treatment of *Goldrich* proves our rejection of the earlier case, the natural conclusion is, in fact, much simpler—in *Stoltz,* we did not engage with *Goldrich* because we did not need to.

Further, the bankruptcy court's reliance upon *Stoltz*'s brief analysis of the statute's legislative history as signaling our departure from *Goldrich*—an argument that Springfield also wields to argue that Section 525(a) should be read broadly— is misplaced. We emphasize that a court may engage with legislative history only when the plain meaning of a provision is ambiguous. Although when there is a statutory ambiguity we may "consult legislative history . . . to discern Congress's meaning," *Chai v. Comm'r of Internal Revenue*, 851 F.3d 190, 218–19 (2d Cir. 2017) (internal quotation marks omitted), "[w]here the statutory language provides a clear answer, [our analysis] ends there," *id.* at 217 (internal quotation marks omitted). Here, because the statutory language is unambiguous, any reliance on legislative history to reach a contrary result is precluded. *See Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's

37

unambiguous terms.  Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous." (internal citations omitted)); *see also Watts*, 86 F.3d at 1093 (noting the "obvious difficulty" with the argument that the legislative history reveals that "a narrow interpretation of section 525 would defeat its purpose . . . is that when an unambiguous statute is interpreted to mean what it says, the interpretation is not narrow"); *Ayes*, 473 F.3d at 111 ("[B]ecause § 525(a) is unambiguous, our interpretation is not 'narrow,' but instead succinctly correct.").

In any event, the legislative history is not as dispositive as the bankruptcy court or Springfield would have it.  To be sure, as both *Stoltz* and the bankruptcy court pointed out, the legislative history of Section 525(a) describes the provision as "not exhaustive" and states that it "permits further development to prohibit actions by governmental . . . organizations or quasi-governmental organizations that perform licensing functions, . . . or by other organizations that can seriously affect the debtor's livelihood."  H. Rep. No. 95-595, at 367 (1977), as *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S. Rep. No. 95-989, at 81, as *reprinted in* 1978 U.S.C.C.A.N. at 5866; *see Stoltz*, 315 F.3d at 92 n.6 (quoting House Report).  However, this same passage also specifies that Section 525(a) applies only to *certain*

38

types of governmental organizations and does not create a blanket prohibition on bankruptcy discrimination, specifically noting that Congress rejected just such a blanket prohibition. *See* S. Rep. No. 95-989, at 81, as *reprinted in* 1978 U.S.C.C.A.N. at 5866 ("The section is not so broad as a comparable section proposed by the Bankruptcy Commission, which would have extended the prohibition to any discrimination, even by private parties." (internal citation omitted)). Moreover, the legislative history also notes that Section 525(a) "does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily." *Id.* At a minimum, the legislative history can be used to support either a broad or narrow reading of Section 525(a) and therefore does not provide clear insight into the intended scope of Section 525(a). Thus, even assuming, *arguendo*, that the statute was ambiguous (which it is not), the legislative history provides little assistance for interpreting the scope of Section 525(a) in this context. *Cf. Gayle*, 342 F.3d at 93–94 (stating that, although we may consider legislative history in the event of a statutory ambiguity, it is "equally important" that there "exist[] authoritative legislative history that assists in discerning what Congress actually meant").

In sum, neither Congress's enactment of Section 525(c) nor our decision in *Stoltz* disturbed *Goldrich's* fundamental holding, which we reaffirm here, that the plain text of Section 525(a) does not cover loan programs. Accordingly, our analysis turns to whether the PPP is properly classified under Section 525(a) as a "loan" or as an "other similar grant."

## C. *PPP is a Loan Program Uncovered by Section 525(a)*

The bankruptcy court concluded that the PPP, "[w]hile nominally designated as a 'loan,'" was, in substance, a "grant or support program[] aimed at helping people in financial distress" due to the PPP's forgiveness mechanism and lack of underwriting. Special App'x at 19. We disagree and conclude that the PPP is, in substance and in form, a loan program that is not covered under Section 525(a).

Although we recognize that we must analyze the substance of the PPP, rather than just its nomenclature, it is nevertheless significant that Congress chose to characterize the PPP as a "loan" in the CARES Act. Indeed, the CARES Act uses the word "loan" approximately 75 times when describing the PPP. *See Tradeways, Ltd.*, 2020 WL 3447767, at *17 ("In total, the word 'loan' appears some 75 times in the CARES Act provisions establishing the PPP. The takeaway is clear: the $659

billion disbursed to borrowers through the PPP are loans, not grants."). For instance, as just a small sample, the CARES Act authorizes the SBA to "guarantee covered loans" issued pursuant to the PPP, 15 U.S.C. § 636(a)(36)(B), directs the SBA to "register the loan" no less than 15 days after "the date on which a loan is made," *id.* § 636(a)(36)(C), refers to the maximum amount of PPP that can be received as a "[m]aximum loan amount," *id.* § 636(a)(36)(E), and describes lenders as employing the SBA's authority to "make and approve covered loans," *id.* § 636(a)(F)(ii)(I). Classifying the PPP as a grant program, rather than a loan program, thus directly contradicts the references to it as a loan in the CARES Act. *See Conn. Nat'l Bank*, 503 U.S. at 253–54.

To be sure, if the PPP truly operated as a grant, its mere designation as a "loan" in the CARES Act would not prevent us from classifying it as a "grant" for purposes of Section 525(a). However, that is not the case here. Instead, the substance of the PPP conclusively demonstrates that it is, as described, a loan guaranty program, not a grant program.

First, the structure of the PPP provides compelling support for our conclusion. As discussed above, Congress placed the PPP within Section 7(a) of the Small Business Act—the SBA's primary mechanism for providing financial

41

assistance to businesses—and authorized the SBA to adopt the "same terms, conditions, and processes" for PPP loans as for 7(a) loans. 15 U.S.C. § 636(a)(36)(B); *see Pharaohs*, 990 F.3d at 224. Further, consistent with the SBA's standard loan practices, "PPP loans are made through private lenders and participants sign promissory notes, subject to SBA guarantees." *Schuessler*, 2020 WL 2621186, at *9; *see* 11 U.S.C. § 636(a)(36)(F)(ii)(II); 85 Fed. Reg. at 23,450–51. Additionally, PPP loans share several other common loan features, including set interest rates, maturation dates, refinancing terms, and deferral mechanisms. *See, e.g.*, 11 U.S.C. § 636(a)(36)(L)–(M); 85 Fed. Reg. at 20,811, 20,813–14.

Second, the forgiveness mechanism upon which Springfield's argument so heavily relies does not automatically convert PPP funds from loans into grants. For one thing, forgiveness is neither automatic nor guaranteed. A borrower must apply for forgiveness, which will only be granted if specified criteria are met, *see* 11 U.S.C. § 636m(b)–(d), and the CARES Act places several additional conditions upon obtaining forgiveness. For example, funds are not forgivable if the employer does not spend a minimum amount of the loan directly on payroll expenses, *id.* § 636m(d)(8), and the potential forgivable amount is reduced if employee salaries are decreased by more than 25%, *id.* § 636m(d)(3)(A). Further, if the loans are not

used for statutorily authorized purposes—which do not fully overlap with all statutorily *permissible uses*—the loans must be repaid in full to the private lender. *See* 85 Fed. Reg. at 20,814. Moreover, the PPP's forgiveness mechanism is not especially unique, as there are other federal loan programs that allow debtors to obtain forgiveness under certain criteria. *See, e.g.*, 20 U.S.C. § 1087e(m)(1) (Public Service Loan Forgiveness Program); 20 U.S.C. § 1087j(b) (Teacher Loan Forgiveness Program). In short, the mere existence of a forgiveness option does not turn the PPP into a grant of "free money," as the bankruptcy court characterized it. Special App'x at 20. A forgiveness option, favorable as it is, cannot alter the structure of what a loan forgiveness program fundamentally is— namely, a program to forgive *loans*.

Third, although Springfield argues that the SBA "conducts no review for creditworthiness or to determine 'sound value' of applications," Appellee Springfield's Br. at 37, and although the bankruptcy court concluded that the "lack of any underwriting" indicated that the PPP does not issue true "loans," *see* Special App'x at 19, these arguments again disregard the plain language of the CARES Act. The Act explicitly preserves Section 7(a)'s "sound value" requirement for all PPP loans. *See* 15 U.S.C. § 636(a)(6) ("All loans made under this subsection shall

43

be of such sound value or so secured as reasonably to assure repayment."); *see also*

*In re Gateway Radiology*, 983 F.3d at 1257 ("Congress knew how to suspend or render inapplicable to PPP loans the traditional § 7(a) requirements when it wanted to do so, and it did that with some of the requirements.  But not the sound value requirement.").  Moreover, PPP funds are not distributed without any risk-mitigation mechanisms or any expectation of repayment.  PPP loans are structured with explicit risk-management features, such as the promissory note requirement, as well as features that expressly contemplate repayment, such as set interest rates, maturation dates, and deferral mechanisms.  *See* 85 Fed. Reg. at 20,811, 20,813–14; 85 Fed. Reg. at 23,450–51.  Further, the SBA's decision to bar bankrupt debtors from receiving these loans is itself a means of screening for creditworthiness.  *See* 85 Fed. Reg. at 23,451 ("The Administrator, in consultation with the Secretary [of the Treasury], determined that providing PPP loans to debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds or non-repayment of unforgiven loans.").  In short, the streamlined underwriting and credit assessment processes for the PPP loans, taken in the context of the program's other features, do not convert PPP loans into grants.  Instead, these streamlined processes represent deliberate choices made to best distribute much-needed loans

44

quickly and efficiently in the middle of a pandemic. *See, e.g.,* 85 Fed. Reg. at 20,811 ("The intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously."); *id.* at 20,811–20,812 ("The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID-19 emergency."). Where Congress has deliberately designed what is plainly a loan program under the CARES Act, we cannot controvert its clear intent and re-classify the PPP as a "grant" program for purposes of Section 525(a).

The bankruptcy court, however, determined that the PPP is an "other similar grant" protected by Section 525(a) because: (1) the PPP's favorable terms "confer unique benefits impossible to obtain from the private sector;" and (2) would "seriously affect [Springfield's] ability to continue business operations and successfully reorganize," which it concluded was essential to Springfield's fresh start. Special App'x at 20 (internal quotation marks omitted). In so doing, the bankruptcy court relied on a strained analogy to the public housing lease at issue in *Stoltz* that we conclude is inapposite.

*Stoltz*, in analyzing the parameters of Section 525(a), focused its analysis on a specific set of government-issued property interests that relate to an individual's ability to access or pursue their livelihood: "[a] debtor who cannot obtain her real

estate license will be unable to pursue her chosen profession; a debtor who cannot obtain his transcript will be unable to apply for certain jobs or further schooling; a debtor who cannot obtain a driver's license will be unable to commute to many jobs or school." *Stoltz*, 315 F.3d at 90. As the Sixth Circuit explained, the items enumerated in Section 525(a) implicate the "government's role as a gatekeeper in determining who may pursue certain livelihoods," *Toth*, 136 F.3d at 480, and, as the Fourth Circuit noted, "are all governmental authorizations that typically permit an individual to pursue some occupation or endeavor aimed at economic betterment," *Ayes*, 473 F.3d at 108.[21] The public housing lease in *Stoltz* clearly fit within these interests; individuals qualify for a public housing lease because they cannot afford privately available housing and, thus, the lease could only be obtained from the government. *See Stoltz*, 315 F.3d at 90. Further, the denial of a lease could lead to eviction or homelessness, making the lease essential to the debtor's future. *See id.*

When applied to the PPP, this analogy breaks down. If a governmental

---

[21] The Fourth Circuit noted that this understanding also reconciles any potential tension between the student loans at issue in *Goldrich* (now protected under Section 525(c)) and other, unprotected loans, stating that, "[b]ecause education is often crucial to securing employment, [Section] 525(c)'s prohibition against discrimination in the granting of student loan guaranties to bankrupts is consistent with [Section] 525's goal of allowing former debtors in bankruptcy to earn a living." *Ayes*, 473 F.3d at 110 n.6.

46

entity refuses to issue a professional license to a debtor, that debtor is unequivocally denied entry into that profession. But if a governmental entity refuses to guarantee a PPP loan for a debtor, that debtor is not unequivocally excluded from receiving capital from other sources. Ineligible debtors can still seek traditional loans from a bank (even if private commercial loans would not carry the same generous terms as PPP loans) or can receive other governmental support grants as, in fact, Springfield did. Although the denial of a PPP loan may inhibit a would-be borrower's ability to access capital, that rejection does not bar borrowers from operating their businesses or prevent them from pursuing their chosen profession.

In short, the PPP loans, by their nature, do not share the "common qualities of the property interests protected under section 525(a)" as identified in *Stoltz*— that is, such loans are not "property interests unobtainable from the private sector and essential to a debtor's fresh start." 315 F.3d at 90; *see also In re Vestavia Hills, Ltd.*, 630 B.R. at 849 ("[T]he inability to receive [PPP funds] does not foreclose the person or entity from engaging their chosen livelihood, as the inability to obtain a license to operate or a business charter would."); *Tradeways*, 2020 WL 3447767, at *19 ("Unlike the denial of a medical license or a building permit, the rejection of a

borrower's PPP application does not completely foreclose the borrower from legally pursuing a career. To the contrary, the borrower remains uninhibited to conduct business." (internal citations, quotation marks, and alterations omitted)); *In re Penobscot Valley Hosp.*, 2020 WL 3032939, at *14 (concluding that "[t]he exclusion of persons involved in bankruptcy from the PPP does not conflict with the fresh start or otherwise frustrate the operation of the Bankruptcy Code" as "the exclusion . . . is not similar to denying a debtor a license to operate in his chosen field and thereby denying the debtor the opportunity to pursue economic betterment"); *Henry Anesthesia Assocs.*, 2020 WL 3002124, at *7 ("Through the PPP, the government agrees to guarantee loans for eligible borrowers, and agrees to forgive those loans if certain conditions are met. However, no legislative authority is required to contract for a loan, a loan guarantee, or even forgiveness of a loan, and all of these transactions can be obtained in the private market.").

In sum, we recognize the economic hardships caused by the COVID-19 pandemic to businesses like Springfield, as well as the undoubted usefulness of additional governmental aid in continuing Springfield's operations and allowing it to provide necessary medical services to the community. However, our understanding of the economic realities facing businesses in a pandemic cannot

controvert the plain language of the Section 525(a) or our binding precedent in *Goldrich* that reinforces the meaning of that plain language.

D. *Subsequent Legislation*

Although our conclusion relies on the plain text of the statute, we note that the additional PPP legislation enacted after the CARES Act provides further support for our interpretation of Section 525(a). We have emphasized the need to approach post-enactment legislation with caution. *See In re Clinton Nurseries, Inc.*, 998 F.3d 56, 66 n.9 (2d Cir. 2021). However, in this particular instance, Congress's subsequent legislation supports its clear intent that PPP loans are not covered by Section 525(a).

In the Consolidated Appropriations Act, 2021, Congress amended Section 525 to expressly bar discrimination based on bankruptcy status in the provisioning of certain CARES Act benefits—such as foreclosure moratoriums, 15 U.S.C. § 9056, forbearance of certain residential mortgages, *id.* § 9057, and eviction moratoriums, *id.* § 9058—but notably did *not* include PPP loans in this amendment, *see* 11 U.S.C. § 525(d) ("A person may not be denied relief under sections 4022 through 4024 of the CARES Act (15 U.S.C. 9056, 9057, 9058) because the person is or has been a debtor under this title."), *repealed by* Consolidated Appropriations Act, 2021, Pub.

L. 116-260, Div. FF, Title X § 1001(c)(2), 134 Stat. 3217 (Dec. 27, 2020).[22] The SBA argues that the clear negative inference from this amendment is that other provisions of the CARES Act are *not* covered by Section 525(a). We agree. As discussed above, "[w]e presume that Congress legislates against the backdrop of existing law." *Pharaohs*, 990 F.3d at 227 (citing *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006)). Congress's amendment of Section 525 to include some provisions of the CARES Act, but not others, allows us to draw the clear inference that Congress decided *not* to extend the provision's protections to any portion of the Act other than those expressly identified in the new Section 525(d). *See Pharaohs*, 990 F.3d at 227 (concluding that Congress's modification of a longstanding rule under Section 7(a) to include some types of businesses but exclude others "strongly suggest[ed] that Congress deliberately chose not to change the Administrator's statutory discretion to exclude businesses, other than those it expressly identified in the CARES Act").

Moreover, as part of the Consolidated Appropriations Act, 2021, Congress enacted the Economic Aid Act, creating a "process through which the SBA

---

[22] The Consolidated Appropriations Act, 2021, contained a sunset provision providing that subsection (d) of Section 525 would be automatically repealed one year after the date of enactment—*i.e.*, on December 27, 2021.

Administrator can issue a written determination that will render certain entities in bankruptcy eligible for PPP loans." Appellant SBA's Br. at 28 (citing Economic Aid Act § 320(a), (f), 134 Stat. at 2015–16). If we were to read Section 525(a) as covering PPP loans—if we were to assume all bankrupt debtors were already protected from discrimination *without* requiring approval from the Administrator—this provision would be unnecessary. *See Tablie v. Gonzales*, 471 F.3d 60, 64 (2d Cir. 2006) ("We are obliged to give effect, if possible, to every clause and word of a statute, and to render none superfluous." (internal quotation marks and alterations omitted)).

Insofar as Springfield argues that this subsequent legislation merely reflects Congress's choice not to definitively speak on the issue and instead allow the courts to determine the scope of Section 525(a), we disagree. It is clear that Congress *did* definitively speak on the matter, first, by designating the PPP as loans and placing them within Section 7(a) and second, by extending Section 525's protections to only certain CARES Act provisions, and not the PPP. This conclusion is especially apparent given that prior to these amendments, as discussed above, the overwhelming majority of federal courts to address the issue concluded that Section 525(a) does not cover PPP loans. If that interpretation of

51

Section 525(a) were truly antithetical to Congress's wishes, as Springfield suggests, it would seem strange to conclude that Congress amended Section 525 but did not make its intended construction clear, all to deliberately allow federal courts to continue reaching what Congress viewed as the wrong conclusion. Had Congress intended Section 525(a) to apply to PPP loan guarantees, it would have expressly stated so in the Consolidated Appropriations Act in 2021, as it did with other CARES Act sections and as it did previously with student loans in enacting Section 525(c) after *Goldrich*.

~*~*~*~*~*~

In sum, we conclude that the PPP is a loan guaranty program and not an "other similar grant," and we hold that Section 525(a) does not apply to PPP loans. Accordingly, the bankruptcy court incorrectly ruled that Springfield was entitled to summary judgment and we instead conclude, as a matter of law, that summary judgment in SBA's favor is warranted on the Section 525(a) claim. Moreover, because the bankruptcy court's decision to issue a permanent injunction rested on that same error of law, we conclude that the injunction against the SBA should be vacated. *See ACORN*, 618 F.3d at 133. Accordingly, we need not, and do not, decide whether Section 634(b)(1) renders the SBA immune from injunctive relief.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the judgment, **VACATE** the permanent injunction, and **REMAND** to the bankruptcy court for further proceedings consistent with this opinion.